*In re* MARRIAGE OF STEVEN M. ROBERTS, Petitioner-Appellee, and JENNIFER L. ROBERTS, Respondent-Appellant.

Fourth District    No. 4—94—0638

Argued February 16, 1995.—Opinion filed April 27, 1995.

Holly W. Jordan and Adam B. Hirschfeld (argued), both of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C., of Champaign, for appellant.

Reino C. Lanto, Jr. (argued), of Wilson & Lanto, of Rantoul, for appellee.

Harvey C. Welch, of Urbana, guardian *ad litem*.

JUSTICE GREEN delivered the opinion of the court:

This concerns a dispute between a former husband and wife as to the custody of a child born during their marriage but who is determined at the time of dissolution not to be the child of the husband. The decision requires consideration of the doctrine of the superior right of a natural parent and also the public policy of protecting the best interests of the child. No decision of a court of review of this State which is directly on point has been called to our attention.

On November 6, 1992, petitioner Steven M. Roberts filed a petition in the circuit court of Champaign County seeking dissolution of his marriage to respondent Jennifer L. Roberts and requesting the sole custody of the child born August 1, 1990, during that marriage on the basis the best interests of the child would be served thereby. On November 12, 1992, the court entered an interim order of protection directing respondent to vacate the marital residence and to turn over to petitioner exclusive possession of the residence and temporary custody of the child. On November 18, 1992, respondent filed a responsive pleading to the petition alleging that petitioner was not the natural parent of the child. Respondent had raised this same issue earlier in a separate proceeding consolidated with this case in the circuit court.

Blood tests performed on April 7, 1993, indicated that petitioner was not the father of the child born during the marriage. On August

11, 1993, the court entered a bifurcated judgment dissolving the marriage but leaving all other matters for future determination. After hearing further evidence, the court entered a final order on June 9, 1994. The court ruled that under the circumstances shown, petitioner was an "equitable parent" of the child and, thus, the usual criterion of the child's best interests was to be applied to determine custody. Having made that legal analysis, the court had no difficulty determining that the best interests of the child required placing the child with petitioner subject to reasonable visitation. The court also found that respondent was estopped to assert petitioner's lack of parentage.

Respondent has appealed the portion of the final order which awarded custody of the child to petitioner. Her principal contention on appeal is that the circuit court erred in rejecting the superior rights of a natural parent doctrine and adopting the "equitable parent" doctrine which permitted the court to award custody on the basis of the best interests of the child. She also asserts that the court erred in finding estoppel and in requiring her to pay one-half of the fee of the guardian *ad litem* (GAL) for the child. We reverse the order of custody and remand for reconsideration in accordance with the rulings of this opinion. We vacate the order in regard to respondent's payment of GAL fees and order reconsideration of that issue.

One of the circumstances which the court considered in determining that petitioner was an "equitable parent" of the child arose from the court's determination that respondent misled petitioner into believing for a long time that he was the natural father of the child. We consider first the evidence on this point. Respondent gave birth to the child on August 1, 1990. At the time the dissolution proceedings began in the fall of 1992, the parties were both members of the United States Air Force and were stationed at Chanute Air Force Base (Chanute) at Rantoul, Illinois.

The parties agreed that they began having intercourse in mid- to late-December 1989. They differed as to whether petitioner knew he was not the father of the child when they were married. He maintained he did not and thought he was the child's father. He testified he would not have married respondent nor would he have provided for the child had he thought another was the child's father. He further testified that, nevertheless, he grew to love the child very much and wanted to keep him.

Respondent testified that she told petitioner of the fact that another man was the child's father before the marriage and her mother testified that on the wedding day petitioner admitted to her that he was not the child's father. Respondent's mother's "common-law

husband" testified to a similar conversation with petitioner on that date. Respondent also testified she was present when petitioner had a conversation with the child's natural father and the father said he did not care about the pregnancy. Petitioner testified that respondent was aware that he placed his name on the baby's birth certificate as the father and respondent denied she was aware of it.

■ If the parties first had intercourse in late December 1989, when the child was born on August 1, 1990, the child was at least two months short of having a usual gestation period of approximately nine months, yet the child weighed 8¹/₂ pounds at birth. At least by that time, petitioner would likely have understood that he was not the father of the child. However, the evidence was fairly evenly balanced as to whether petitioner did not know he was not the father of the child for several months. The finding of the court in this respect was not contrary to the manifest weight of the evidence.

The evidence presented in regard to the best interests of the child was not as evenly balanced as that concerning petitioner's knowledge of his parental status and whether respondent deceived him in that respect. However, because of the complicated legal problems involved in determining whether this evidence was properly considered and to illustrate some of the problems that arise if we do not consider it, we set forth that evidence in detail.

Petitioner testified that (1) even after respondent recovered from the cesarean operation she had at the time of the birth, he continued to do considerable housework and baby care; (2) he always took care of the child when he came home from work; (3) he was sent to Korea in the spring of 1991; (4) respondent later admitted that while he was gone, she had traveled to see another man in Alaska and on another occasion took the child to see that man's parents in Texas; (5) when he resumed living with her, she once, while intoxicated, caused an hysterical scene in the child's presence; and (6) on another occasion, in the child's presence, she kicked and broke the windshield of their automobile.

Petitioner further testified that (1) immediately prior to his filing the instant petition to dissolve the marriage, respondent left for Oklahoma, leaving the child with him, and came back one week later and called the police claiming he had kidnapped the child; (2) while at Chanute, he would often come home at lunch time and find respondent lying on the couch while the child had still not been dressed or fed; (3) when he came home at night, he often took the child outside to play while respondent remained on the couch watching television; and (4) when he had temporary custody, he had a consistent schedule of coming home in the evening, making a dinner, playing with the

child, reading, giving the child a bath, and getting his clothes ready for the next day.

According to petitioner, shortly after he was given temporary custody, respondent left for Oklahoma and only made 13 of her scheduled 28 visits thereafter. Petitioner further stated that respondent did not advise him when she was going to keep a scheduled visit. Petitioner explained that respondent suffered from multiple sclerosis and would at times lose consciousness or wake up temporarily paralyzed. He also said that after the child was born respondent experienced rapid and violent mood swings. He admitted that when he was in Korea, respondent did care for the child. He stated that he works a five-day-a-week swing shift and has a private babysitter to care for the child. Petitioner's mother's testimony generally supported his.

Dr. Marty Traver, a clinical psychologist, testified on behalf of petitioner that (1) she evaluated both petitioner and the minor child; (2) she found petitioner was a stable, mentally healthy individual; (3) she found that petitioner had bonded with the child, and petitioner exhibited appropriate parenting techniques; (4) she found the child to be a normal healthy, happy little boy; (5) the strong bond between petitioner and the child, then three years old, was essential to the child's ability to develop long-term relationships in the future; (6) she believed that if petitioner was no longer a part of the child's life it would have serious impact on the child; (7) she did not evaluate respondent and had no opinion regarding her; and (8) she made no recommendations for petitioner or the child because she did not find anything that needed remedying.

Susan Plemons testified on behalf of petitioner that (1) she and her husband previously resided at Chanute and were friends with the petitioner and respondent; (2) she has a teaching degree and practical experience teaching young children; (3) during their friendship she would see petitioner outside playing with the parties' child; (4) after petitioner received temporary custody, she would see them outside playing every evening; (5) petitioner posted a schedule of their activities on the refrigerator; (6) petitioner would cook a balanced dinner in the evening and give the child a bath before bed; (7) she rarely ever saw respondent play in the yard with the child; (8) she noticed that when respondent cared for the child, the child acted aggressively, and when petitioner cared for him, the child was calmer; (9) on the few occasions she saw respondent feed the child, the only food she ever saw her feed him was pop and cake; (10) when the parties' child hit another child, respondent would tell that child to hit the parties' child back; and (11) she observed respondent experience rapid and intense mood swings.

Plemons further testified that (1) in October 1992, respondent was away for one week leaving the child with petitioner and, upon respondent's return, respondent immediately became upset and started grabbing the child from petitioner's arms, greatly upsetting the child; (2) there were other occasions when respondent lost control of herself and started screaming; (3) when temporary custody was transferred to petitioner, respondent left the marital residence in a complete mess, leaving spoiled food and dirty diapers all over the house; (4) when they were cleaning the house after respondent left they found a book on "Satanism or the seduction or abduction of children"; (5) while the child was in petitioner's custody, she observed petitioner implement appropriate discipline; (6) she observed the child frequently tell petitioner he loved him; and (7) she observed the child cry when he had to go on visitation with respondent.

Lisa Truax testified for petitioner that (1) she has been friends with both petitioner and respondent; (2) she knew the parties while they were stationed at Vandenburg Air Force Base and then again at Chanute; (3) on a daily basis she observed respondent care for the child and noted that respondent would get the child up late and lay on the couch until the afternoon, not feed him breakfast, and not give him healthy snacks; (4) she observed that generally the child was afraid of respondent; (5) respondent disciplined the child by hitting him in the head or mouth; (6) the child did not look to respondent for comfort; (7) she never observed respondent hold and show affection to the child; (8) on several occasions while shopping with respondent, she witnessed respondent allow the child to take something from a store; and (9) respondent was angry at petitioner for getting the child's hair cut so she took the child and had his head "shaved with stripes on the side of his head."

Truax further testified that (1) she knew of respondent's relationship with another man while petitioner was in Korea, and on one occasion respondent went to visit the man in Alaska and left the child with neighbors; (2) respondent encouraged the child to refer to the other man as dad; (3) she took respondent to the bus station in October 1992 when respondent attempted to leave petitioner to live in Oklahoma; (4) respondent told her that she thought it was best to leave the child with petitioner because a "boy needs to be with his dad"; (5) she had observed respondent's mood swings and had seen her physically attack petitioner; (6) she had never seen petitioner hit or threaten to hit respondent; (7) the child seemed to prefer to be with petitioner; (8) while in petitioner's custody, the child was always well fed, clean and happy; (9) the child never asked for respondent; and (10) respondent told her that her mood swings were a result of her multiple sclerosis.

Respondent testified that (1) she did all of the feeding and caring for the child when he was first born; (2) she did not start fights with petitioner in the child's presence; and (3) she has been the child's primary caretaker and has provided him healthy meals. She maintained that petitioner physically abused her and that he also left the child alone in the house strapped to a car seat. She maintained that when she went to Oklahoma in October 1992, she left the child with petitioner because he had threatened suicide if she took the child with her. Petitioner denied that he strapped the child to a car seat.

The circuit court determined that the best interests of the child would be served by awarding custody to petitioner. We now examine the question of whether those best interests can be properly considered by a trial court under the circumstances here. We hold that those best interests can be considered if done within the proper context, which was not done here.

The procedure by which a party seeks custody in a dissolution proceeding is governed by section 601 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act), subsections (a) and (b) of which state as follows:

"(a) A court of this State competent to decide child custody matters has jurisdiction to make a child custody determination in original or modification proceedings as provided in Section 4 of the Uniform Child Custody Jurisdiction Act [(750 ILCS 35/1 *et seq.* (West 1992))] as adopted by this State.

(b) A child custody proceeding is commenced in the court:

(1) by a parent, by filing a petition:

(i) for dissolution of marriage or legal separation or declaration of invalidity of marriage; or

(ii) for custody of the child, in the county in which he is permanently resident or found; or

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents." 750 ILCS 5/601(a), (b) (West 1992).

Section 5 of the Illinois Parentage Act of 1984 (Parentage Act) provides, in part, as follows:

"Presumption of Paternity. (a) A man is presumed to be the natural father of a child if:

(1) *he and the child's natural mother are or have been married to each other*, even though the marriage is or could be declared invalid, *and the child is born or conceived during such marriage;*
    ***

(b) A presumption under this Section may be rebutted by clear and convincing evidence." (Emphasis added.) 750 ILCS 45/5 (West 1992).

"Any presumption of parentage as set forth in Section 5 of this [Parentage] Act is rebutted if the court finds that the conclusion of the experts excludes paternity of the presumed father." 750 ILCS 45/11(g) (West 1992).

The provisions of the Parentage Act apply to all proceedings to determine paternity regardless of whether they are brought under that statute. *In re Marriage of Allen* (1994), 265 Ill. App. 3d 208, 212, 638 N.E.2d 340, 343; 750 ILCS 45/5 (West 1992).

The situation facing the circuit court in awarding custody here was a most difficult one. The court concluded that the child's interests would better be served by being in the custody of petitioner, but he was not the natural father of the child. The court also felt that respondent had unfairly deceived petitioner in regard to his parentage. In a comprehensive judgment order, the circuit court sought to solve the problem by applying a doctrine which estopped respondent from objecting to the placement of custody with petitioner and also adopted a rule whereby petitioner would be considered an "equitable parent" of the child and thus on a par with respondent in regard to the standard to be applied in determining custody. The court rejected the superior rights doctrine.

The circuit court's order gave particular significance to the cases of *In re Petition of Doe* (1993), 254 Ill. App. 3d 405, 627 N.E.2d 648, *rev'd* (1994), 159 Ill. 2d 347, 638 N.E.2d 181, and *In re A.K.* (1993), 250 Ill. App. 3d 981, 620 N.E.2d 572. The court's rejection of the superior right of natural parents was based upon the *Doe* opinion of the appellate court. There, the court stated that a child's "best interest and corollary rights" are superior to "anything else, including the interests and rights of biological and adoptive parents." (*Doe*, 254 Ill. App. 3d at 411, 627 N.E.2d at 652.) However, that decision was set aside in the highly publicized case before the supreme court, the majority opinion in which stressed the rights of natural parents. (*Doe*, 159 Ill. 2d at 351, 638 N.E.2d at 182-83.) *A.K.* involved a proceeding under the Juvenile Court Act of 1987 (Juvenile Act) where a child was alleged to be abused. (Ill. Rev. Stat. 1987, ch. 37, par. 802—3(2)(a)(i).) The man married to the child's mother when the child was born was found not to be the natural father. This court held that this husband was entitled to remain in the case as a party to the proceedings in order to be heard as to the disposition of the child but that he did not have parental rights in regard to the child. The majority rejected the "equitable parent" doctrine but Justice Cook advocated adoption of that theory in a comprehensive dissent (*A.K.*, 250 Ill. App. 3d at 990-96, 624 N.E.2d at 578-83 (Cook, J., dissenting)).

■ In view of the supreme court decision in *Doe*, the circuit court erred in rejecting the doctrine concerning the superior rights of natural parents. We again refuse to adopt the equitable parent doctrine. It recognizes the equity in treating a person who has acted as a father and done so properly and effectively as the father. However, it places such a "parent" on the same level as a natural parent and is in derogation of the doctrine of the superior right of natural parents which is deeply imbedded in Illinois law. However, we understand the concerns of the trial court and hold that on remand the circuit court is not barred by the superior rights doctrine from awarding custody to petitioner but the circuit court must use a different standard than before in determining whether to do so.

The doctrine of the superior right of a natural parent to the custody of a child is fully explained in *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 427 N.E.2d 1231. There, a natural father of a child born out of wedlock filed a petition in the circuit court for custody of that child, who had been in the custody of her half sister since the child's mother had been incarcerated for the murder of the natural father's wife. The circuit court granted custody to the half sister. The natural father appealed and the case ultimately came before the supreme court, which held in favor of the natural father.

The *Townsend* court set forth the superior rights doctrine primarily in these words:

> "In child-custody disputes it is an accepted presumption that the right or interest of a natural parent in the care, custody and control of a child is superior to the claim of a third person. *The presumption is not absolute and serves only as one of several factors used by courts in resolving the ultimately controlling question of where the best interests of the child lie.* (See *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201[, 247 N.E.2d 417]; *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556[, 158 N.E.2d 613]; *Cormack v. Marshall* (1904), 211 Ill. 519[, 71 N.E. 1077]; *Halstead v. Halstead* (1966), 259 Iowa 526, 144 N.W.2d 861; Annot., 45 A.L.R.3d 216 (1972); Annot., 31 A.L.R.3d 1187 (1970).) A court need not find that the natural parent is unfit or has forfeited his custodial rights before awarding custody to another person if the best interests of the child will be served. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209[, 247 N.E.2d 417, 421]; *Soldner v. Soldner* (1979), 69 Ill. App. 3d 97[, 386 N.E.2d 1153].) This standard or 'guiding star' (*Nye v. Nye* (1952), 411 Ill. 408, 415[, 105 N.E.2d 300, 304]) is a simple one designed to accommodate the often complex and unique circumstances of a particular case." (Emphasis added.) *Townsend*, 86 Ill. 2d at 508, 427 N.E.2d at 1234.

The admonition in *Townsend* that the superior right of natural parents is not absolute is placed in context by the supreme court in its recent decision in *In re Petition of Kirchner* (1995), 164 Ill. 2d 468. That case concerned a petition for an original writ of *habeas corpus* by the supreme court in order to enable the natural father to obtain custody of the child whose adoption was overturned by that court in *Doe.* The *Kirchner* opinion explained that the *Townsend* theory that the superior right of natural parents is not absolute was not applicable there because those proceedings involved the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)), where natural parents' rights can be taken away only when they are unfit, while *Townsend* involved a dispute under the Probate Act of 1975 (755 ILCS 5/1 *et seq.* (West 1992)), where those parents' rights could be set aside more easily. *Kirchner*, 164 Ill. 2d at 484-85.

Section 602 of the Dissolution Act states that the "best interest of the child" is the basis for determining custody under that legislation. (750 ILCS 5/602 (West 1992).) Thus, under the rationale of *Kirchner*, the superior rights doctrine would not be absolute in Dissolution Act proceedings but would only be a factor to consider as stated in *Townsend.* That same theory would also distinguish this case from *A.K.*, which arose under the Juvenile Act, which requires a stronger showing than best interests of the child in taking away custody from a natural parent.

One more question arises in connection with the statutory and common-law scheme involved here. That is whether petitioner had standing to seek custody of the child under section 601 of the Dissolution Act. Shortly before the petition for dissolution was filed, respondent did leave for Oklahoma to be with a male friend while leaving the child with petitioner. However, she soon returned. The excursion was too short-lived to have deprived respondent of custody of the child within the meaning of section 601(b)(2). (See *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 53-54, 491 N.E.2d 1150, 1152-53.) Accordingly, we must determine whether petitioner was a "parent" within the meaning of section 601(b)(1).

■ Section 5(a)(1) of the Parentage Act creates a presumption that petitioner was the father of the child because the child was born while he was married to the child's mother. That presumption had not been rebutted when the petition for dissolution was filed. This court has looked at the status of a husband of the natural mother of a child at the time a visitation order was issued to determine the husband had standing to obtain visitation although the court later determined that the husband was not the child's father. (*Allen*, 265 Ill. App. 3d at 211-12, 638 N.E.2d at 343.) Moreover, generally standing to seek relief is based upon the status of the party seeking relief

at the time relief is sought. See *In re Estate of Brown* (1990), 207 Ill. App. 3d 139, 146, 565 N.E.2d 312, 316; *Village of Kildeer v. Village of Lake Zurich* (1988), 167 Ill. App. 3d 783, 786, 521 N.E.2d 1252, 1254.

We deem an interpretation of section 601(b)(1) of the Dissolution Act that makes the date of seeking relief the date that determines whether a person has standing as a "parent" is sensible even though respondent challenged his paternity with her first pleading. Although we may well see quite a few more cases like this one now that paternity blood tests are so accurate, we do not think we are opening the floodgates. The concerns of those who advocate an estoppel theory or a doctrine of "equitable parent" are real. By rejecting those latter theories but giving persons such as petitioner a standing to seek relief under the *Townsend* standard, we are answering those concerns while still upholding the superior rights of natural parents. Under *Townsend*, those superior rights are given weight but are considered along with other factors concerning the children's best interest.

■ We find no merit to other contentions of petitioner or respondent except in regard to the requirement that respondent pay one-half of the GAL fee. Respondent did not waive her right to challenge petitioner's standing by any pleading failure. She raised the issue in her first pleading. Petitioner is incorrect in maintaining that she should have raised it by a motion on special and limited appearance. Such a motion is appropriate only when contesting personal jurisdiction. (735 ILCS 5/2—301(a) (West 1992).) The apportionment of the GAL's fee must be vacated and redetermined as respondent's ability to pay may be different depending on whether she is awarded custody.

We reverse the portion of the judgment awarding custody to petitioner and remand to the circuit court of Champaign County for reconsideration in accordance with this opinion. If the trial judge is available, he shall reconsider without further evidence. If a new judge is required to hear the matter on remand, he may hear new evidence. The order on respondent to pay one-half of the GAL fee is vacated and the court shall reconsider that issue anew at the time of rehearing and may hear evidence in that respect.

Reversed in part; vacated in part and remanded with directions.

KNECHT, P.J., and McCULLOUGH, J., concur.