THE DEPARTMENT OF PUBLIC AID *ex rel.* KILEY GAGNON-DIX, a Minor, by Debra Dix, Petitioner, v. CHARLES GAGNON, Respondent-Appellee (Debra Dix, Petitioner-Appellant).

Fourth District    No. 4—95—0623

Opinion filed May 28, 1997.

William D. Reid, of Elmore & Reid, of Springfield, for appellant.

Timothy D. Sturm, of Sturm & Germeraad, of Springfield, for appellee.

JUSTICE COOK delivered the opinion of the court:

In March 1994, the Illinois Department of Public Aid (Department) filed a petition to determine paternity on behalf of Kiley Gagnon-Dix, a minor, by Debra Dix, her mother. Paternity was subsequently established by a blood test. In January 1995, respondent Charles Gagnon admitted paternity, and in February 1995, he filed a petition for visitation, which was granted by the trial court in June 1995. Later that month, petitioner Debra Dix moved to reopen, stay visitation, and appoint a guardian *ad litem* (GAL). The trial court granted the motions. A GAL was appointed and interviewed Kiley, Dix, and Gagnon. After considering the GAL's report, the trial court again granted respondent visitation. Petitioner Dix appeals, maintaining the trial court's ruling was against the manifest weight of the evidence and the court erred in not appointing a GAL at the outset of the case. Her motion for an emergency stay was denied. The Department was involved in trial court proceedings to determine paternity and establish child support but is not party to this appeal. We affirm.

## I. BACKGROUND

Kiley was born to Dix on November 6, 1986. Dix notified Gagnon of her pregnancy. He was then in the United States Marine Corps

stationed at Camp Le Jeune, North Carolina. She also notified him of Kiley's birth.

On January 29, 1987, Dix filed a petition for support in this case under the Revised Uniform Reciprocal Enforcement of Support Act (URESA) (Ill. Rev. Stat. 1985, ch. 40, par. 1201 *et seq.*) against Gagnon, which the circuit court transferred to North Carolina. On October 19, 1989, the superior court of Oslow County, North Carolina, dismissed the action without prejudice as Gagnon had been discharged from the Marine Corps and moved to Springfield, Illinois.

On April 2, 1990, Gagnon stated through his attorney (by letter referencing this case number) that, in the event he were determined to be Kiley's father, he was prepared to do "the right thing." The letter noted statutory child support was $120 per month, stated he would exercise regular visitation, set out a proposed visitation schedule and asked to hear from Dix within 10 days.

On March 24, 1994, the Department filed a petition to determine the existence of a father-and-child relationship. Blood tests were ordered. Following the results of the tests, on February 15, 1995, the trial court entered an agreed order of parentage.

On February 24, 1995, Gagnon filed a petition for visitation. Since the time of Kiley's birth, Gagnon had not had contact with her. After hearing evidence on March 17, the trial court granted visitation by order of June 9, 1995.

On June 21, 1995, Dix moved to stay visitation, reopen the case, and appoint a GAL. A GAL was appointed and, in her July 1995 report, recommended that visitation be granted. On July 13, 1995, the trial court conducted another evidentiary hearing and *in camera* interview. On July 28, 1995, the trial judge, after considering the GAL's report and determining that visitation would be in the best interest of Kiley, ordered visitation. Dix appeals.

## II. ANALYSIS

■ Gagnon did not file a brief in this appeal. The standard of review in such instances is governed by *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 345 N.E.2d 493 (1976). Under *Talandis*, "if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief, the court of review should decide the merits of the appeal." *Talandis*, 63 Ill. 2d at 133, 345 N.E.2d at 495. We choose to decide this case on the merits.

First, Dix argues that the trial court's ruling was against the manifest weight of the evidence. We disagree.

The GAL's report recommended visitation. It noted that, while

Kiley stated she did not want to meet her father, her reasons for this position were not clearly stated and appeared to be a mixture of her feelings and those of her mother. The GAL found Kiley had definite apprehension in meeting Gagnon. On the other hand, at one point Kiley stated it "might be fun" to know her father "if he was strong" and could give her piggyback rides to bed.

The GAL also found that Gagnon appeared to truly want to start a relationship with his daughter and undertook steps to ease her transition. The report noted he had a bedroom for Kiley and intended to enlist the aid of his sisters to decorate it in an appropriate fashion. The GAL was also impressed by his statement that he had arranged for his young niece to come to Springfield from Chicago to meet Kiley the first weekend the visitation had been scheduled.

The GAL noted that, while Dix's protectiveness toward her daughter was natural, her bitterness toward Gagnon was influencing Kiley. The GAL concluded Kiley certainly had room for another adult figure in her life and recommended gradual visitation.

At the July 1995 hearing on the visitation petition, Dix testified she told Kiley on March 19, 1995, that she had a father (but not his name): "After telling her, I just told her that she probably will have to meet him. Hopefully we could avoid that, but there was only so much that I could do." Both Dix and Kiley shed tears in this discussion, and Dix had talked to Kiley about it two or three times a week since. Dix prepared Kiley for the *in camera* interview: "I told her it was a very serious thing and what she decided and what she said would affect her future"; "I told her she needed to say how she felt." The child, age eight, indicated she did not want to see her father.

■ The fact that DCFS has obtained an order establishing paternity and setting child support does not mean that the father is automatically entitled to visitation, especially in a case like this, where the child is eight years old. The Illinois Parentage Act of 1984 (Parentage Act) provides that, if a judgment of parentage contains provisions for visitation, the court shall determine visitation:

> "in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act [(Marriage Act)] and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child. In determining custody, joint custody, or visitation, the court shall apply the *relevant* standards of the [Marriage Act]." (Emphasis added.) 750 ILCS 45/14(a)(1) (West 1994).

We reject the view that the Parentage Act thereby incorporates section 607(a) of the Marriage Act, requiring a court to award visitation to a noncustodial parent unless the court finds, after a hearing, that

visitation "would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 5/607(a) (West 1994). The endangerment standard is an onerous one. *In re Marriage of Hanson*, 112 Ill. App. 3d 564, 568, 445 N.E.2d 912, 915 (1983) (a dissolution of marriage case).

The reference in section 14(a)(1) of the Parentage Act to the factors set forth in the Marriage Act to determine the best interest of the child is a reference to section 602 of the Marriage Act (750 ILCS 5/602 (West 1994)), not to section 607 of the Marriage Act (750 ILCS 5/607 (West 1994)). The section 14(a)(1) reference to "*relevant* standards" makes it clear that not every rule a court would apply to a parent in a dissolution of marriage case applies with equal force to a parent in a parentage case. (Emphasis added.) 750 ILCS 45/14(a)(1) (West 1994). There is no presumption that it is in the best interest of a child to have visitation with a biological father who has had nothing to do with the child for eight years. In fact, the parental rights of an unmarried father may be terminated where he does not seek to establish paternity or pay birth expenses or provide support. 750 ILCS 50/1(D)(n)(2) (West 1994) (definition of "unfit person"). It would be inconsistent to legislatively mandate visitation for a biological father whose parental rights could be terminated if a petition seeking that relief were filed.

■ We hold the burden of proof in these cases is on the noncustodial parent seeking visitation. A request for visitation might in some cases be a vindictive response to a request for child support, and the noncustodial parent's goal might not be the development of a relationship with the child, but the annoyance of the custodial parent. Where the court determines that the noncustodial parent has a genuine interest in the child, however, the benefits of some sort of visitation may outweigh any accompanying disruption. The court has discretion to grant or deny requests for visitation in Parentage Act cases based on its determination of the child's best interest. The record here provides a basis for awarding visitation. The trial court's ruling was not against the manifest weight of the evidence.

The case law cited by Dix is inapposite. In *Weybright v. Puckett*, 262 Ill. App. 3d 605, 635 N.E.2d 119 (1994), this court affirmed the trial court's denial of visitation to a paternal grandmother on the basis that visitation was not in the best interest of the child. We note that we affirmed the trial court's exercise of discretion in *Weybright*, as we do here. *Weybright* is further not analogous, because it involved a determination of the rights of a grandparent, rather than a parent. We have noted that "[g]randparents *** do not step into their *** children's shoes in regard to visitation" under the Marriage Act (750

ILCS 5/101 *et seq.* (West 1992)). *Weybright*, 262 Ill. App. 3d at 608, 635 N.E.2d at 121. Grandparents' rights do not equate with those of parents, because parents have responsibilities toward their children that do not burden grandparents. *Weybright*, 262 Ill. App. 3d at 608, 635 N.E.2d at 121-22.

■ Dix is correct when she points out that Kiley's preference should not be overlooked (although she is incorrect in stating it is a *primary* factor). *Frail v. Frail*, 54 Ill. App. 3d 1013, 1016, 370 N.E.2d 303, 305 (1977). It was not overlooked. As it was made clear in the GAL's report, Kiley's preference was difficult to discern: on the one hand, she experienced an understandable apprehension; on the other hand, she was looking forward to meeting Gagnon. The trial judge, after interviewing Kiley *in camera*, concluded that visitation would be in her best interest. This ruling was not against the manifest weight of the evidence. We have reviewed the other cases cited by Dix (*Griffiths v. Griffiths*, 127 Ill. App. 3d 126, 468 N.E.2d 482 (1984); *In re Custody of Horbatenko*, 176 Ill. App. 3d 970, 531 N.E.2d 1011 (1988); *LeHew v. Mellyn*, 131 Ill. App. 3d 314, 475 N.E.2d 913 (1985); *People ex rel. Vallera v. Rivera*, 39 Ill. App. 3d 775, 351 N.E.2d 391 (1976); *In re Custody of D.A.*, 201 Ill. App. 3d 810, 558 N.E.2d 1355 (1990)), and they do not require a contrary result. In *D.A.*, for example, petitioner sought a finding of paternity (perhaps to bring a lawsuit for the death of the mother in a Chicago Transit Authority accident) in preference to respondent with whom the child had a parent-child relationship. There is no similar effort to supplant an apparent father in this case.

■ Dix next argues "plain error" in the trial court's failure to appoint a GAL at the outset of the proceedings. Counsel states: "The court must appoint a [GAL] before any issue is determined that might affect the child," citing *McDonald v. McGowan*, 163 Ill. App. 3d 697, 516 N.E.2d 934 (1987).

First, *McDonald* is not authority for that proposition, nor does the law impose such a requirement. The GAL performed valuable services in this case, but it was not essential that a GAL be appointed. Often the child's interests are adequately protected by one or the other parent, or by the court, and the appointment of a GAL is not worth the cost. See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 417, 639 N.E.2d 897, 905 (1994).

Second, at the outset of the March 1995 hearing, the court stated it would probably appoint a GAL but it was taking advantage of time it then had to hear evidence; both parties were apprised they could present other evidence as needed when the matter was rescheduled. When Gagnon was asked if he had any objection to a GAL being ap-

pointed, he said he did not. The court and Gagnon's counsel engaged in a brief colloquy on the possible GAL appointment before Gagnon was tendered for cross-examination. At the April 3, 1995, hearing on economic issues, Dix acknowledged she would drop her support action if Gagnon dropped the visitation petition. In questioning by the court Dix stated: "I cannot afford your [GAL], I have released my attorney, I cannot afford this."

On April 6, 1995 (filed June 9, 1995), Dix advised the court and Gagnon's attorney by letter that her employing unit would cease to exist June 30 and she would be employed elsewhere as of July 1; she requested the case be expedited and concluded by mid-June. On April 26, 1995, a motion to withdraw as counsel for Dix was filed on behalf of Brown, Hay and Stephens stating it was advised she did not have funds to engage attorneys in the matter and would represent herself. On May 5, 1995, Dix filed her appearance as party *pro se* and the court allowed the law firm to withdraw. On June 1, the court by letter advised it had decided it was in Kiley's best interest to begin visitation with her father, according to the schedule his attorney had proposed, and directed counsel to prepare the order. Not until her June 21, 1995, motion to reopen, represented by new counsel, did Dix seek appointment of a GAL. The court then accommodated her and made the appointment.

Third, there is nothing in the record demonstrating prejudice to Dix or Kiley.

### III. CONCLUSION

In closing, we are constrained to admonish the parties that it is for each of them to rise above their personal differences and fears and to cultivate Kiley's relationship, love, and respect for each other. In Kiley's presence and within her hearing, each should be discussed only in a positive way by the parties and their friends and relatives. Perhaps Gagnon and his family should have been involved in Kiley's life earlier, but let that situation now be remedied. So far as the record before this court shows, the parties have an intelligent child to raise and they should cooperate to that end.

For the foregoing reasons, the ruling of the trial court is affirmed.

Affirmed.

STEIGMANN, P.J., and KNECHT, J., concur.