685 N.E.2d 1038 (1997)
292 Ill. App.3d 379
226 Ill.Dec. 583
In re the MARRIAGE OF Kara SLAYTON, f/k/a Kara Strappe, Petitioner-Appellant, and Thomas James Strappe, Respondent-Appellee (In re the Parentage of Brandon James Strappe, Kara Slayton and Jeffrey Slayton, Petitioners-Appellants,
v.
Thomas James Strappe, Respondent-Appellee.)
No. 4-97-0240.
Appellate Court of Illinois, Fourth District.
Argued August 20, 1997.
Decided October 8, 1997.
*1039 Kim Kelley, Peoria (argued), for Kara Slayton.
Michael A. Fleming (argued), Cusack, Fleming, Gilfillan & O'Day, Peoria, for Thomas Strappe.
Marcia F. Straub, Peoria, for Brandon Strappe.
Justice COOK delivered the opinion of the court:
Kara Slayton, f/k/a Kara Strappe, and Jeffrey Slayton appeal an order of the circuit court of Peoria County granting Thomas Strappe (Tom) visitation with their minor son, Brandon. Jeff and Kara are Brandon's biological parents, but Brandon was born during Kara's marriage to Tom. Kara and Jeff contend that because Tom is not Brandon's biological father, he should not have been granted visitation absent a "compelling reason" why he should be permitted to interfere with their "constitutionally protected parental rights." Kara and Jeff further contend that the court erred in finding that permanent visitation was in Brandon's best interests. We affirm.
Kara and Tom were married on July 12, 1986, and Kara gave birth to Brandon on May 12, 1989. The family resided in Elmwood, Illinois. Tom, having no reason to suspect otherwise, raised Brandon as his son. Tom's first indication that Brandon was not his natural child came in February 1991, when Kara petitioned for dissolution of marriage, case No. 91-D-109. In her petition, Kara alleged that no children were born of the marriage. If Kara had filed her petition for dissolution of marriage after May 12, 1991, she would not have been permitted to question Tom's paternity. See 750 ILCS 45/8(a)(3) (West 1994) (two-year Parentage Act statute of limitations). The trial court granted dissolution of the marriage, reserved substantive issues until later, awarded Kara temporary custody of Brandon and granted Tom visitation. In March 1991, Jeff filed a paternity action, No. 91-F-253, claiming that he was Brandon's biological father. No action was taken on the paternity suit until April 1992, when the trial court consolidated it with the marriage dissolution proceedings.
Jeff and Kara married on May 9, 1992, but lived apart during much of the marriage. Kara lived in Illinois (with another man, for a period) and Jeff lived in Missouri, then Wisconsin. Tom continued to exercise visitation with Brandon on alternate weekends plus two five-hour periods each week.
In October 1992, the court appointed a guardian ad litem (GAL) to represent Brandon's interests. The GAL filed paternity actions against both Jeff and Tom. In January 1993, blood tests were ordered over Tom's objection that testing should not be performed without first determining whether such testing was in Brandon's best interests. The test results established that Tom could not be Brandon's biological father and that there was a 99.8% probability that Jeff was the father.
Jeff and Kara's marriage was dissolved in September 1993. Kara retained temporary custody of Brandon, subject to visitation by both Jeff and Tom. (At the time of Jeff and Kara's divorce, Jeff supported Tom's efforts to gain custody of Brandon.) In September *1040 1993, Kara moved for summary judgment on the issue of Brandon's paternity. In April 1994, the trial court granted summary judgment, ruling that Jeff was Brandon's biological father. In May 1994, Kara and Jeff filed a stipulated request that Kara be awarded permanent custody of Brandon. Kara also filed a motion seeking permission to remove Brandon to Wisconsin, where Jeff was now living. Kara and Jeff stipulated that they contemplated reconciliation and possible remarriage. The court ruled that because Tom was not Brandon's biological father, he lacked standing to contest Kara and Jeff's custody agreement. Accordingly, the court granted Kara custody and permission to remove Brandon to Wisconsin. Based on the recommendations of Dr. John Day, a courtappointed psychologist, the court determined that it was in Brandon's best interests to continue visitation with Tom, said visitation to occur every third weekend. This visitation order expired in January 1995 and all visitation ceased.
Tom appealed, contending that the trial court should have conducted a "best interests hearing" to determine whether an attack on his presumed paternity should have been allowed. Tom further contended that the court erred when it determined he lacked standing to seek custody of Brandon. The third district held that, under the facts presented, it was no longer useful to determine whether the paternity action was in Brandon's best interests, but the trial court erred in finding that Tom lacked standing. Therefore, the third district reversed the order granting Kara custody of Brandon and remanded the cause to allow both Kara and Tom to seek custody under section 601 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/601 (West 1994)). In re Marriage of Slayton, 277 Ill.App.3d 574, 214 Ill.Dec. 117, 660 N.E.2d 562 (1996).
On remand, Tom filed a motion for temporary visitation pending resolution of custody. On March 28, 1996, the court conducted a hearing on Tom's motion. Prior to the start of evidence, the court ruled that Tom was entitled to reasonable visitation unless Kara and Jeff met their burden of proving "that visitation would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 5/607(a) (West 1994).
At the time of the hearing, Brandon was nearly seven years old. He had been living with Jeff and Kara in Saukville, Wisconsin, since August 1994, and he had not seen Tom for 14 months. Brandon was in first grade, doing well in school, and participating in sports. Kara and Jeff both testified that when Tom had last had visitation, August 1994 through January 1995, the visits were quite disruptive to their family schedule. Both parents worked full-time, and the visits periodically interfered with Brandon's soccer and baseball activities. It is 270 miles from Saukville, Wisconsin, to Tom's place in Elmwood, Illinois, and the drive took 4½ hours, or 2½ hours to a drop-off point in Rochelle, Illinois.
Kara and Jeff testified that Brandon exhibited nervous habits after he moved to Wisconsin, including bed-wetting, chewing, and biting. Brandon would get uncharacteristically quiet before visiting Tom. After the visits stopped, Brandon's bed-wetting and other nervous habits ceased.
Dr. Day, a clinical psychologist, testified that he performed psychological evaluations of Brandon and the parties in 1994 and found that the adults were all psychologically normal and all interested in Brandon's wellbeing. Dr. Day met again with Brandon briefly in January 1996. Based on his observations and teacher reports, Dr. Day concluded that Brandon was adapting well to Wisconsin. Brandon identified with Jeff and Kara as his "psychological parents." Back in 1994, Dr. Day had recommended some visitation take place to assist Brandon in the detachment process from his former life in Illinois and Tom, but he had recommended that the visitation stop after six months. Tom had now been absent from Brandon's life for 14 months, and Dr. Day believed that resuming visitation was not in Brandon's best interests, nor was it likely to strengthen the bond between Brandon and Tom. Brandon had previously told Dr. Day that he did not want to visit Tom, and Tom did not assume for him the role of psychological father. Visitation would create an "artificial construction" that "could have some very negative *1041 psychological effects on the child." When asked whether visitation would seriously endanger Brandon's emotional well-being, Dr. Day said there was the potential for that, depending on how Brandon's resistance to visitation was met by the adults in his life.
The court then interviewed Brandon in camera. Brandon shook his head when asked whether he remembered Tom, but nodded when asked whether he remembered Tom's new wife, Rhonda. Brandon simply shrugged when asked whether he wanted to visit Tom. The court directed a finding in favor of Tom at the close of Jeff and Kara's case, ruling that they did not meet their burden of showing that visitation would seriously endanger the child.
In the interim between the temporary visitation hearing and the custody hearing, Kara and Jeff remarried. Kara sought child support payments from Tom and Tom was ordered to pay $40 per week into a college fund. Tom exercised visitation every third weekend.
The custody hearing was held in January 1997, six years after Kara petitioned for dissolution of marriage. Brandon was now almost eight years old and attending second grade. By all accounts, he was a well-adjusted and popular child. He continued to do well in school, and he was participating in Cub Scouts and several sports. Jeff testified that Brandon would complain every second or third trip to see Tom, because the visits interfered with his plans and sports activities. When visitation was resumed, Brandon would complain of stomachaches just before visits, but the complaints had stopped. Jeff stated that Brandon became uncommonly quiet and sullen during the drive to see Tom, but he was always rowdy on the return trip. Jeff and Kara would tell Brandon that there was nothing they could do about the visits, go ahead and have a good time, they'll spoil you, it will only be for 1½ days. On cross-examination, Jeff revealed he resisted Tom's attempts to reschedule visits to accommodate Brandon's schedule, and Kara and he did not discuss their vacation plans with Tom. Jeff, Kara and Brandon would frequently travel to Central Illinois apart from taking Brandon to visit Tom, as both Jeff and Kara had family in Central Illinois. Kara's testimony largely mirrored Jeff's testimony.
Dr. Day testified that he had met with Kara, Jeff, and Brandon on two occasions since the last hearing; he had not met with Tom or observed Tom's interaction with Brandon. During a meeting with Dr. Day, Brandon expressed displeasure with an upcoming visit. He was irritated at having to spend so much time in the car. Dr. Day believed Brandon clearly identified Kara and Jeff as his parents. Dr. Day described Kara, Jeff, and Brandon as an "intact nuclear family." He believed that forced visitation was in neither Brandon's nor Tom's best interests and forced visitation was likely to create feelings of resentment. However, he acknowledged that it was common for children to express irritation with missing activities and having to travel; the psychological effect was probably the same as a "normal divorce," except Brandon was very aware that Jeff is his "real daddy."
Tom presented evidence from numerous witnesses, including his wife Rhonda, Rhonda's mother, his parents, his sister, and a cousin and her husband, that Brandon appeared to enjoy visitation with Tom and Tom's family. Tom's family recounted how much they enjoyed Brandon's visits and that they considered Brandon a part of their family.
Rhonda and Tom described how everyone was a little tense when visitation resumed, but Brandon's nervousness abated by the third or fourth visit. A number of witnesses recounted that Brandon displayed affection toward Tom and called him "dad" during recent visits. Rhonda and Tom noted that Brandon was tense and reserved when in the presence of both Tom and Kara or Jeff, but Brandon's hesitancy disappeared when Jeff and Kara were not present.
Tom testified that there was nothing about Brandon's demeanor to suggest he does not want to be there during visits; if Tom felt that Brandon truly did not want to be there, without being influenced by adults, he would not force Brandon to come. Tom testified he could cooperate with Kara and Jeff in arranging visits, although he had a pending *1042 lawsuit against them seeking money damages for his loss of relationship with Brandon. Tom stated he loved Brandon and treated him no differently than Justin, his biological son by Rhonda. Rhonda testified that she supported Tom's efforts to be with Brandon despite the financial hardships the litigation has caused. She saw her relationship with Brandon as friendly, without usurping Kara's role as mother. She observed that Brandon's relationship with Justin was warm and brotherly; Brandon played with and protected Justin.
The court conducted another in camera interview with Brandon. Brandon was mad about the temporary visitation order "because I don't like to be away from my mom and dad." He stated that grandmother Strappe, Tom's mother, was a pretty nice lady. He indicated that he would not miss Tom, Rhonda, and Justin if he never went to visit them again.
During closing arguments, Kara and Jeff argued that as Brandon's natural family, they were entitled to the "greatest constitutional protection against state interference." They further argued that the court apply the "best interest" standard and terminate visitation. The GAL also argued that the court should consider Brandon's best interest and terminate visitation. Tom argued that the third district had ruled he was a "parent" for purposes of these proceedings and, thus, he was entitled to reasonable visitation unless visitation posed serious endangerment to Brandon. The court awarded Jeff and Kara custody of Brandon, subject to visitation by Tom. Tom received substantially the same amount of visitation time as before, but in fewer blocks (basically, seven visits per year) to reduce the amount of time Brandon spends travelling between Illinois and Wisconsin. Although the court used the "best interests" standard in determining custody, it is unclear what standard the court used in determining Tom's visitation rights.
Normally, "[a] parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 57607(a) (West 1994). Jeff and Kara contend that to apply the section 607 "serious endangerment" standard here would be an unconstitutional interference with their parental rights under the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV), where Tom is not a biological parent and the child lives with his intact, biological family. They contend that the proper standard to apply when a nonparent seeks visitation is the best interest of the child, and the nonparent should have the burden of showing a "compelling reason" why the nuclear family should be disrupted by visitation. Tom responds that when the appellate court found he was a parent for custody purposes, he was also found a parent for visitation purposes and, thus, section 607(a) of the Act applies.
We disagree with Tom that the third district's ruling in Slayton compels a finding that Tom has equivalent rights to visitation as those possessed by a biological noncustodial parent. In Slayton, the court simply ruled that Tom was to be considered a "parent" for purposes of standing to seek custody under section 601 of the Act (750 ILCS 5/601 (West 1992)). Slayton, 277 Ill.App.3d at 578, 214 Ill.Dec. at 120, 660 N.E.2d at 565. In so ruling, the Slayton court adopted this court's holding in In re Marriage of Roberts, 271 Ill.App.3d 972, 208 Ill.Dec. 683, 649 N.E.2d 1344 (1995). Slayton, 277 Ill.App.3d at 578, 214 Ill.Dec. at 120, 660 N.E.2d at 565. Roberts was premised on the general rule that standing to seek relief is based upon the status of the party at the time relief is sought. A man is presumed to be the natural father of a child if the child is conceived during the man's marriage to the child's mother, although the presumption of paternity may be rebutted by clear and convincing evidence. See 750 ILCS 45/5(a)(1),(b) (West 1994). Roberts held that where the presumption of paternity has not been rebutted as of the time a man first sought custody, then the man is to be considered a "parent" for standing purposes under section 601 of the Act. Roberts, 271 Ill.App.3d at 982, 208 Ill.Dec. at 690, 649 N.E.2d at 1351.
Nevertheless, we decline to fashion a different standard for nonbiological parents than the standard set forth in section 607 of *1043 the Act. 750 ILCS 5/607 (West 1994). First, we agree with Tom that Jeff and Kara have waived the argument that a different standard is constitutionally compelled. A party has the obligation of raising a constitutional question at the earliest fair opportunity. Stark v. Pollution Control Board, 177 Ill. App.3d 293, 296, 126 Ill.Dec. 624, 626, 532 N.E.2d 309, 311 (1988). Although claims that a statute is unconstitutional may be raised at any time (In re H.R., 283 Ill.App.3d 907, 908, 219 Ill.Dec. 428, 429, 671 N.E.2d 93, 94 (1996)), a reviewing court will generally not rule upon constitutional issues unless they were raised below and passed upon by the trial court. Saunders v. Michigan Avenue National Bank, 278 Ill.App.3d 307, 311, 214 Ill.Dec. 1036, 1040-41, 662 N.E.2d 602, 606-07 (1996). Jeff and Kara did not raise their constitutional claim until the close of the custody hearing. At that time, they did not identify what constitutional provision afforded them protection against visitation, nor did they suggest the trial court apply the standard they now advancethat the United States Constitution demands no visitation absent a "compelling reason." Second, we doubt that applying section 607 violates Jeff and Kara's constitutional rights. Although the United States Supreme Court cases cited by them do support the proposition that the rights of natural parents are afforded constitutional protection, none of the cited cases are on point, and the cases also support the proposition that the rights sprung from biology are not absolute. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (unmarried, natural father lacking custodial, personal or financial relationship with child was not entitled to notice of adoption proceedings under the due process and equal protection clauses of the fourteenth amendment). The doctrine of pater is est is quem nuptiae demonstrantthe presumption that the husband is the father of a child born of the marriagehas long been a part of our common law heritage, and the long recognized rights of presumed fathers can hardly be said to offend the United States Constitution.
Finally, we decline to adopt a new visitation standard for nonbiological parents because we see no principled way to legislate this standard. Although the "no visitation except for a compelling reason" standard advanced by Kara and Jeff might be a reasonable rule, we find no statutory support for grafting this rule onto section 607(a) of the Act. "Compelling reason" or similar language has been used elsewhere in case law where third parties have sought to defeat the superior rights of natural parents (see In re Custody of Townsend, 86 Ill.2d 502, 510, 56 Ill.Dec. 685, 689, 427 N.E.2d 1231, 1235), but the use of this language in visitation disputes is unprecedented and would unduly complicate section 607(a) analyses. Jeff and Kara note that the legislature has manifested its intent to protect intact nuclear families from interfering visitation by nonparents: section 607(b) of the Act was amended to prevent grandparents or siblings from petitioning for visitation when the nuclear family is intact. 750 ILCS 607(b)(2)(A) (West 1994); Pub. Act 86-1452, § 1, eff. July 1, 1991 (1990 Ill. Laws 3385, 3386-87). Nevertheless, we believe that any decision to rewrite section 607(a) must come from the legislature. Accordingly, we hold that section 607(a) of the Act governed Tom's visitation rights.
Having found that section 607(a) applies, we have no trouble in finding that Tom was entitled to reasonable visitation. "The endangerment standard embodied in [section 607(a)] has been described as onerous, stringent, and rigorous." In re Marriage of Diehl, 221 Ill.App.3d 410, 429, 164 Ill.Dec. 73, 86, 582 N.E.2d 281, 294 (1991). Liberal visitation is the rule, restricted visitation is the exception, and thus the custodial parent bears the burden of proving by a preponderance of the evidence that visitation with the noncustodial parent would seriously endanger the child. Diehl, 221 Ill.App.3d at 429, 164 Ill.Dec. at 86, 582 N.E.2d at 294. A reviewing court will not interfere with the trial court's determination in the absence of an abuse of discretion, or unless manifest injustice has been done to the child or parent. Diehl, 221 Ill.App.3d at 429,164 Ill.Dec. at 86, 582 N.E.2d at 294.
Here, although there was evidence that Brandon resented the interruption caused by visits, the trial court could reasonably conclude *1044 that this anger did not amount to a serious threat to Brandon's emotional development. Although Dr. Day speculated that emotional damage might occur, he also acknowledged that Brandon's feelings of anger and irritation were similar to those in a "normal" divorce. In any case, the psychologist's testimony was not necessarily determinative. See In re Marriage of Milovich, 105 Ill.App.3d 596, 610, 61 Ill.Dec. 456, 467, 434 N.E.2d 811, 822 (1982). No claims were made that Tom mistreated or endangered Brandon, and there was ample evidence that Brandon enjoyed himself on visits and benefited from contact with an extended "family" who loved him. As the trial court noted, the presence of two fathers in Brandon's life can either be lemons or lemonade. It is clear that visitation does not endanger Brandon, but the parties have done much to sour the situation. In the future, the parties should work harder to foster a loving relationship between Brandon and both of his fathers.
The dissent notes that section 14(a)(1) of the Illinois Parentage Act of 1984 (750 ILCS 45/14(a)(1) (West 1994)) "establishes visitation as a privilege in a paternity action." (Emphasis in original.) Op. at 590 of 226 Ill.Dec. at 1045 of 685 N.E.2d. The relationship between Tom and Brandon, however, was not established by a blood test. Cf. Department of Public Aid ex rel. Gagnon-Dix v. Gagnon, 288 Ill.App.3d 424, 427, 223 Ill.Dec. 776, 778, 680 N.E.2d 509, 511 (1997). We hold that the relationship between Tom and Brandon is controlled by the Act in general and by section 607(a) in particular.
For the first years of his life, both Brandon and Tom believed that Tom was Brandon's father. Bonding occurred between the two. Slayton, 277 Ill.App.3d at 576, 214 Ill.Dec. at 119, 660 N.E.2d at 564. The record indicates that Brandon was not aware Tom was not his father until Brandon was approximately five years old. It was a great tragedy that the trial court in the original proceedings determined that, because Tom was not the biological father, he had no standing to contest either custody or removal. Perhaps it is not surprising that Dr. Day at that time went along with the program and recommended that Tom be phased out and replaced as Brandon's parent by Jeff, and that Tom's visitation continue for only six months. Other courts have been critical of expert testimony recommending the denial of visitation with a child's de facto parents. In re Ashley K., 212 Ill.App.3d 849, 889, 156 Ill.Dec. 925, 949-51, 571 N.E.2d 905, 929-30 (1991). Dr. Day did recognize that because of the relationship between Tom and Brandon it would not be in Brandon's best interests to terminate visitation immediately. Unfortunately, by the time the appellate court reversed the trial court on the standing issue, there had been no visitation for more than a year. Dr. Day has had little recent contact with the parties.
No one can say with certainty what will be in Brandon's best interests in the future, not this court, not the trial court, not Dr. Day, and not even Brandon. Sometimes children later regret that they have lost contact with a parent, sometimes they even blame themselves for the loss. In re Marriage of Hefer, 282 Ill.App.3d 73, 76, 217 Ill.Dec. 701, 704, 667 N.E.2d 1094, 1097 (1996). It is not clear that Brandon will not need a father figure at some time in the future. The legislature has expressed its views. Visitation is mandatory "unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 57607(a) (West 1994). The endangerment standard is an onerous one and not easily met. In re Marriage of Lewis, 188 Ill.App.3d 142, 146, 135 Ill.Dec. 667, 670, 544 N.E.2d 24, 27 (1989). Children often do not like visitation, especially visitation at a distance, because of the inconvenience involved. We do not let children (especially seven-year-old children) decide whether there should be visitation, however, for the same reason we do not let them decide who should have custody. See Hefer, 282 Ill.App.3d at 76, 217 Ill.Dec. at 704, 667 N.E.2d at 1097. The solution in this case is not termination of visitation, but accommodation and adjustment of visitation to meet the needs of the parties.
In most custody disputes, the actions of both parties can be criticized. It is unfair to *1045 suggest that the problems in this case are attributable to Tom.
Affirmed.
STEIGMANN, P.J., concurs.
McCULLOUGH, J., dissents.
Justice McCULLOUGH, dissenting:
I respectfully dissent. The current order of visitation is against the manifest weight of the evidence.
In child custody and visitation cases, it is difficult for witnesses close to a party to be objective and unbiased. Here, one witness who testified cannot be considered biased or prejudiced in favor of any of the parties.
Psychologist John Day was first contacted by Tom's attorney for the purpose of evaluating Brandon as to the custody issue. After Day was contacted by Tom, he was also used by Kara and Jeff for purposes of evaluation of Brandon. Day did not know any of the parties prior to being contacted by Tom and it is clear Day was not in the posture of a socalled "hired gun."
The following are some excerpts from his testimony:
"[T]here is no psychological, pathological reason to be concerned about the adult persons in the case.
* * * * * *
[I]t was not being particularly helpful to force the relationship and the child was perceiving it as something that was forced. I think the parents worked very hard to make sure they stayed absolutely neutral.
* * * * * *
* * * [T]he child's relationship with the parents seemed like what we would call a nuclear family. There was a family intact. Clear family identity. The child had established himself in a home and in a geographic location and he had very clear identity of who he was in that regard and who his parents were and he referred to Jeff and to Kara as mom and his dad. The relationship with Tom, because it's sporadic and so on, was much more distant and so that close bonding was not there and he was bonding into this family unit.
* * * * * *
* * * If there's to be a relationship, it's going to have to be in a more relaxed voluntary level on the part of the child anyway. I think this is working against the very things that Tom would like to have happen.
Q. Can you explain that a little bit.
A. Well, the anger of the child. The irritation of having to come down here. That becomes personalized to Tom and, you know, as a result Tom kind of gets the brunt of it is what I'm sensing with the child. I'm not surethat certainly isn't constructive to building a relationship to child and adult.
* * * * * *
Q. * * *[I]f he continues to have one weekend a month of court-ordered visitation with Tom, your professional opinion is likely to result in what?
A. Greater psychological distance and barrier with Tom. That's what I alluded to. I don't think that serves Tom's own best interest."
Keeping in mind that the judge, not the child, makes visitation determinations, the in camera interview with Brandon was negative as to a seven to eight year old's desire to visit Tom.
In addition, the GAL strongly recommended that visitation with Tom was not in the best interests of Brandon.
A review of the trial judge's statements in granting visitation gives the appearance that because Tom and his family are good people, there should be visitation.
Under section 607(a) of the Act (750 ILCS 5/607(a) (West 1994)), a parent not granted custody has a right to visitation. Section 14(a)(1) of the Illinois Parentage Act of 1984 (750 ILCS 45/14(a)(1) (West 1994)), however, establishes visitation as a privilege in a paternity action. I would find the serious endangerment standard set forth in section 607(a) does not apply to a person in a status similar to Tom. However, even under the serious-endangerment standard of section *1046 607(a) of the Act, the paramount concern is still the best interest of the child. Crichton v. Crichton, 75 Ill.App.3d 326, 329-30, 31 Ill.Dec. 12, 14-15, 393 N.E.2d 1319, 1321-22 (1979), citing Blazina v. Blazina, 42 Ill. App.3d 159, 167, 1 Ill.Dec. 164, 170-71, 356 N.E.2d 164, 170-71 (1976). Roberts, 271 Ill. App.3d at 976, 208 Ill.Dec. at 686, 649 N.E.2d at 1347, is distinguishable from this case. In Roberts, there was expert testimony of a strong bond between the minor child and the mother's former husband and that disruption of the relationship would have a serious impact on the child's ability to develop longterm relationships.
During closing argument, Marcia Straub, the GAL, pointed out that if the relationship in this case continued, Brandon would be continuously reminded he was part of some kind of dysfunctional strange situation. He had been subjected to the selfishness of the adults and the disputes that arose surrounding this issue. His social and educational development had been disrupted. As a result, she recommended that the periodic visitation every three weeks should discontinue.
Tom's interest in the child should not be discouraged, but he should, in the best interest of the child, take a step back and reconsider his role in the child's life.
A manifest injustice has been done to Brandon in this case. I would reverse the judgment of the trial court.