JOSHUA L. WENZELMAN, on Behalf of Connor James Wenzelman, a Minor, Petitioner-Appellee, v. LISA BENNETT, Respondent-Appellant.

Third District    No. 3—00—0529

Opinion filed May 16, 2001.

Brian G. Hiatt, Alan R. Bruggeman (argued), and Andrey Filipowicz, all of Bruggeman, Hurst & Associates, Ltd., of New Lenox, for appellant.

Michelle R. Mosby-Scott (argued), of Allison & Mosby-Scott, of Bloomington, for appellee.

JUSTICE BRESLIN delivered the opinion of the court:

Appellant Lisa Bennett appeals the trial court's order granting petitioner Joshua Wenzelman visitation with their son Connor. Based on the following discussion, we affirm. In doing so, we hold that absent exigent circumstances all biological parents enjoy a presumption that they are entitled to visitation with their children, whether visitation is requested under the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 1998)) or the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 *et seq.* (West 1998)).

## FACTS

Connor was born on September 2, 1998. In that same year, Joshua filed an action to establish paternity and request visitation. In January of 2000, the trial court entered an agreed order establishing paternity and an order setting a temporary visitation schedule. The order gave Joshua visitation on Wednesdays, alternate Saturday mornings, one full weekend each month, and certain holidays.

One year later, the parties attended a hearing regarding permanent visitation. Joshua testified that he was employed at Peddingham Corporation in Bradley, Illinois, that he worked from 7 a.m. to 3 p.m. five days a week, and that he received two weeks of summer vacation each year. Although he sometimes worked 12 hours a day and 6 days a week, he never worked weekends. Joshua stated that he lived with his parents and that he was Connor's primary caregiver when Connor visited. Connor was given his own room and crib at Joshua's parents' house. In the event that Joshua was required to work when Connor visited, his mother and sister were available to babysit. Although Connor fussed a bit when he was picked up, he was always fine afterwards, and he never caused problems during visitation. Joshua denied that Connor was ever returned to his mother in an unkempt condition. On eight separate occasions, including two full weekends, Lisa refused Joshua visitation with his son.

Lisa testified that she was employed at St. Mary's Hospital in Kankakee, Illinois, as a patient care technician and that she lived with her parents. While she was at work, her mother took care of Connor. Lisa complained that Connor cried each time Joshua picked him up, that he did not receive proper care with Joshua, and that he was returned to her in an unkempt condition. Lisa stated that she was willing to let Joshua make up the lost visitation, but Joshua had been uncooperative.

The trial court awarded Lisa sole custody of Connor and ordered Joshua to pay child support. The court also granted Joshua visitation per the following schedule: (a) alternate Fridays from 5:30 p.m. to Sundays at 5:30 p.m.; (b) Wednesdays from 3:30 p.m. to Thursdays at 6:30 a.m. until Connor reached the age of five, then Wednesdays from 3:30 to 8 p.m.; (c) alternate major holidays from 9 a.m. to 5 p.m., splitting Christmas day; and (d) one week each month of June, July, and August, increasing to 10 days each month when Connor reached the age of five and two weeks each month when he turned eight. Lisa filed a motion to reconsider, claiming the court's order of visitation was not in Connor's best interests. The motion was denied and Lisa appealed.

## ANALYSIS

Lisa argues on appeal that the trial court erred when it set a permanent visitation schedule.

This court will not disturb a trial court's decision regarding visitation unless the decision was against the manifest weight of the evidence, manifestly unjust, or there was a clear abuse of discretion. *In re Marriage of Ivey*, 261 Ill. App. 3d 200, 632 N.E.2d 1121 (1994).

Lisa claims that although there is a presumption under section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 1998)) that noncustodial parents are entitled to reasonable visitation with their children, there is no similar presumption for unmarried biological fathers under the Parentage Act (750 ILCS 45/1 *et seq.* (West 1998)). Thus, Joshua was required to prove, and failed to prove, that extended summer visitation was in Connor's best interests and that it would not be disruptive to Connor's life.

In support of her argument, Lisa cites *Department of Public Aid ex rel. Gagnon-Dix v. Gagnon*, 288 Ill. App. 3d 424, 680 N.E.2d 509 (1997), which determined that a biological father, who sought visitation with his daughter with whom he had no contact for eight years, was required to prove that visitation was in the child's best interests. Although Lisa claims that *Gagnon* stands for the proposition that under the Parentage Act there is no presumption that it is in a child's best interest to have visitation with a biological father, we find Lisa's inter-

pretation of *Gagnon* is misplaced. Instead, we interpret *Gagnon* to mean that any parent, in wedlock or out of wedlock, that seeks to establish extensive visitation after eight years of no contact with a child has the burden to show that visitation is in the child's best interests. Absent any indication that no prior relationship existed between parent and child, we determine that a presumption exists in favor of biological parents for visitation.

■ In this case, Joshua, within the first few months after Connor was born, filed an action seeking to establish paternity and to set a visitation schedule. Once a temporary visitation schedule was set, Joshua and Connor visited with one another several times each week. Based on these factors, it is clear that the situation here is unlike the situation in *Gagnon* because Joshua has been involved in Connor's life since he was born. Accordingly, we hold that Joshua is not required to prove that visitation is in Connor's best interests or to prove that visitation would not be disruptive to Connor's life.

■ Lisa also argues that the trial court's award of visitation was against the manifest weight of the evidence.

The record reveals that after Connor was born the parties entered into an agreement establishing paternity and setting a temporary visitation schedule. Joshua testified that he was Connor's primary caregiver when Connor visited and that Connor had his own room and crib at Joshua's parents' house. Although Lisa claims Connor was having problems adjusting to the visitation schedule because he fussed when Joshua picked him up, Joshua testified that Connor was always fine afterwards and did not cause any problems during visitation. There is no evidence that the time Connor spent with his father was disruptive or in contravention of Connor's best interests. In fact, the record indicates that Joshua and Connor have a positive relationship with one another. Based on these factors, we cannot say that the trial court's visitation award was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Kankakee County is affirmed.

Affirmed.

HOLDRIDGE and SLATER, JJ., concur.