# ILLINOIS OFFICIAL REPORTS

*In re Parentage of J.W.*, 2012 IL App (4th) 120212

| | |
|---|---|
| Appellate Court Caption | In re: the Parentage of J.W., a Minor; STEVE TAYLOR, Petitioner-Appellant, v. AMY WILLS-MERRILL and JASON WILLS, Respondents-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-0212 |
| Argued | July 10, 2012 |
| Rule 23 Order filed | July 23, 2012 |
| Rule 23 Order withdrawn | August 15, 2012 |
| Opinion filed | July 23, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where the natural father of respondent's child obtained DNA proof of his paternity several years after the child's birth and filed a paternity action, the appellate court reversed the trial court's decision finding that he was the child's parent but denying his petition for visitation based on the holding in *Gagnon* that the burden of proof is on the noncustodial parent seeking visitation under the Parentage Act to establish that visitation is in the minor's best interest, since the applicable standard is section 607(a) of the Marriage Act, including the presumption that the father is entitled to reasonable visitation rights unless visitation would endanger seriously the child's physical, mental, moral or emotional health, and the cause was remanded for the creation of such visitation. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 09-F-12; the Hon. Karen E. Wall, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | James A. Martinkus (argued), of Erwin, Martinkus & Cole, Ltd., of Champaign, for appellant. |
| | David Sotomayor (argued), of Orland Park, for appellee Jason Wills. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion. Presiding Justice Turner and Justice Appleton concurred in the judgment and opinion. |

## OPINION

¶ 1   In the summer of 2001, respondent, Amy Wills-Merrill, conceived a child, J.W., who was born in April 2002. Amy married respondent, Jason Wills, in March 2003, believing him to be the father of J.W. The couple divorced in January 2006 and Amy had physical custody of J.W. In 2008, petitioner, Steve Taylor, contacted Amy after seeing a photograph of J.W. and asked if she could possibly be his child. Amy answered in the affirmative. Deoxyribonucleic acid (DNA) tests were conducted with the result being a match for Steve as the father of J.W. In February 2009, Steve filed a parentage action pursuant to the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 *et seq.* (West 2008)) to determine the existence of a father and child relationship between himself and J.W.

¶ 2   Meanwhile, in the dissolution action between Amy and Jason, the trial court entered an order at Jason's request ordering Amy to not reside or cohabit with Steve or permit him to have contact with J.W. At Steve's request, the two cases were consolidated in April 2009. In September 2009, an order of parentage was entered as to Steve. No visitation was ordered.

¶ 3   In preparation for a hearing on Steve's request for visitation with J.W., the guardian *ad litem* (GAL) prepared and filed reports on behalf of the minor, and a clinical psychologist also prepared a report. Due to J.W.'s young age and the fact she had a strong relationship with Jason but no prior relationship with Steve, the psychologist and the GAL both recommended no visitation for Steve at the present time. In July 2011, the trial court denied Steve's request for visitation and reserved the issue of child support.

¶ 4        Amy filed a motion to reconsider the trial court's order as to a specific point, and a clarified order was entered in October 2011. In January 2012, the parties entered an agreed order as to child support. In February 2012, Steve filed his notice of appeal, claiming the court erred in requiring him to have the burden of proving visitation was in J.W.'s best interest and the court erred in not granting him any visitation. We reverse and remand with directions.

¶ 5                                         I. BACKGROUND

¶ 6        In June 2001, Jason and Amy began an intimate relationship. Jason enlisted in the United States Army and was soon stationed away from central Illinois. During that same summer, Amy had a one-time sexual encounter with Steve. When she became pregnant, Amy assumed the father of the child was Jason. Jason supported Amy throughout her pregnancy although he was stationed in North Carolina. J.W. was born on April 15, 2002, and Jason was listed as her father on the birth certificate.

¶ 7        On March 14, 2003, Amy and Jason were married in North Carolina. During his military career, Jason served in both Iraq and Afghanistan. On November 5, 2003, Jason was severely injured in Iraq. In December 2003, Jason, Amy, and J.W. returned to Danville, Illinois. They remained together until January 6, 2006, when a dissolution of marriage was granted. Pursuant to the terms of the marital settlement agreement, which stated Jason to be J.W.'s father, Amy was granted sole custody of J.W. but Jason had visitation privileges and support obligations regarding J.W.

¶ 8        In the summer of 2008, Steve saw a picture of J.W. on Amy's account on a social media site. He thought J.W. resembled him and contacted Amy regarding the possibility he was J.W.'s biological father. Amy indicated there was a possibility, which prompted Steve, Amy, and J.W. to submit to DNA testing in the fall of 2008. In September 2008, Amy married Joseph Merrill. Between the summer of 2001 and the summer of 2008, Steve had limited, if any, contact with Amy and no contact with J.W. and had no reason to believe he was J.W.'s father.

¶ 9        When the DNA results indicated Steve was J.W.'s father, Amy left Merrill and began a relationship with Steve. She also notified Jason in November 2008 he was not J.W.'s biological father. At this point in time, J.W. was 5 1/2 years old and Jason was the only father she had ever known. They had a good, close relationship.

¶ 10       Amy decided J.W. should get to know Steve. J.W. spent a lot of time with Steve and his extended family over the holiday season from late November 2008 to January 1, 2009. On February 4, 2009, Steve filed a verified petition to determine the existence of a father-child relationship pursuant to the Parentage Act (750 ILCS 45/1 *et seq.* (West 2008)) in Vermilion County circuit court case No. 09-F-12. In addition to the establishment of paternity, Steve asked for joint custody of J.W. and visitation.

¶ 11       On January 9, 2009, in Vermilion County case No. 05-D-232, the dissolution of marriage case for Jason and Amy, the court entered an order stating Amy shall not reside or cohabit with Steve or permit J.W. to have any contact with Steve or promote the existence of any parental relationship between Steve and J.W. On February 17, 2009, Steve filed a motion to

consolidate the dissolution proceeding between Jason and Amy with his parentage action since both cases were dealing with custody and visitation issues involving J.W. On March 5, 2009, prior to the court granting Steve's motion to consolidate, Jason filed a motion in the parentage case asking for, in the event Steve was determined to be J.W.'s biological father, a hearing to determine the best interests of J.W. before visitation was granted between Steve and J.W.

¶ 12 On April 17, 2009, the parentage action was consolidated with Jason and Amy's dissolution case and a written order was entered embodying the order barring contact between Steve and J.W. as entered in the dissolution case on January 9. On May 13, 2009, Steve filed a motion to vacate, modify, or reconsider the order barring him from any contact with J.W.

¶ 13 On September 9, 2009, in the consolidated cases, the trial court entered an order of parentage as to Steve. However, the court indicated it was not ordering any visitation in the paternity case. The court further stated all previous orders would stand and be enforced. Discovery commenced prior to a hearing on the issue of visitation between Steve and J.W. Financial information for Steve, Amy, and Jason was also gathered for determining child support.

¶ 14 Dr. Marilyn Frey, a clinical psychologist, was approved by all parties and appointed by the trial court to conduct an evaluation to determine whether visitation with Steve and J.W. was in the best interests of J.W. at this time. On October 8, 2010, Dr. Frey filed her report with the court. Dr. Frey interviewed Steve, Amy, and Jason and observed J.W. interact with Jason and Amy. Dr. Frey found no real attachment between J.W. and Steve. J.W. never mentioned Steve when asked by Dr. Frey to name members of her family. Further, Dr. Frey found for a child of J.W.'s young age, introducing Steve to her as her father would be disruptive of her established close relationship with Jason and could easily result in difficulties academically, emotionally, and psychologically as children of that age are very attuned to having their lives function in an orderly manner and wanting to be like their peers. Dr. Frey opined Steve should not have visitation with J.W. at this time and J.W. should be evaluated by a psychologist once a year to determine when she would be ready to have a relationship with Steve.

¶ 15 The GAL appointed by the court on behalf of J.W. also reported it would not be in the best interests of J.W. to have visitation with Steve at this time. The GAL could not get J.W. to mention Steve even when he asked her if there had been any big events occurring in her life recently. When the GAL asked her directly about Steve, J.W. identified him as a friend of her mother's and the brother of her babysitter. She apparently did not identify him as her father or a father figure to her.

¶ 16 On June 8 and 10, 2011, the trial court heard testimony from various witnesses on the issue of visitation between Steve and J.W. Dr. Frey's report was introduced into evidence. Dr. Frey admitted she did not have concrete evidence spending time with Steve would be a danger to J.W. Her opinion was based on her observations of the lack of attachment between J.W. and Steve and child development research indicating multiple potential problems if Steve were made part of J.W.'s life at this time. Dr. Frey left open the possibility of Steve's

involvement in J.W.'s life in the future by asking she be examined by a psychologist once yearly to determine if it would be in her best interest to introduce Steve to her at a later time.

¶ 17    In addition to cross-examining Dr. Frey as to her report, Steve presented the testimony of Dr. Judy Osgood, a counseling psychologist retained to review the report of Dr. Frey. Dr. Osgood testified Steve did not present any risk factors which would create any danger to J.W. She also stated it would be detrimental for J.W. to miss out on contact with Steve and his extended family. Dr. Osgood stated it was in J.W.'s best interest to resume contact with her biological father. Dr. Osgood did not observe J.W. interact with Steve, Jason, or Amy.

¶ 18    Other witnesses, such as Steve's sisters, testified to the good relationship Steve developed with J.W. in the short period of time he was allowed to interact with her. Steve and J.W., and J.W. and the sisters' families, engaged in many activities at Thanksgiving and Christmas of 2008. Steve also testified to the period of time he spent with J.W.

¶ 19    Through the testimony of both Amy and Steve, as well as other witnesses, it was clear Steve had access to J.W. after the court's order barring him from contact with her.

¶ 20    The GAL testified he recommended J.W. not be told of or introduced to a new father. He indicated he was not a psychologist and was relying upon Dr. Frey's opinion. He also noted in his interviews with J.W. she considered Steve to be simply a friend of her mother's and did not identify him as her father, despite being told he was her "real" dad by Amy and Steve in 2008.

¶ 21    On July 18, 2011, the trial court entered an order finding Steve had the burden of proving visitation was in J.W.'s best interest by a preponderance of the evidence. The court then found it was not in the best interest of J.W. for Steve to be introduced into her life at this time and denied his request for visitation. All parties and their families were ordered not to promote the existence of any parental relationship between J.W. and Steve. Further, the court agreed with Dr. Frey's idea of yearly psychological examinations for J.W. and ordered those be facilitated by Amy to determine J.W.'s understanding of Steve's relationship to her. Finally, all prior orders of custody and visitation involving Amy, Jason, and J.W. were to remain in full force and effect and were not modified. The order reserved issues of child support, day care expenses, income tax exemption, and retroactive payments for further hearing.

¶ 22    On August 16, 2011, Amy filed a petition to vacate, modify, or reconsider the order entered as to the issue of the required yearly psychological examinations and who should pay for them. On August 17, 2011, Steve filed a motion for extension of time to file a motion for rehearing, retrial, or modification of judgment or to vacate the judgment. On October 5, 2011, the trial court heard the posttrial motions and took the matter under advisement, reserving Steve's motion for extension of time. On October 13, 2011, the court entered a supplemental order dealing with the issue of yearly psychological examinations for J.W.

¶ 23    On January 26, 2012, the parties presented an agreed order on the remaining issue of child support. On that same date, Steve's motion for extension of time was withdrawn. On February 15, 2012, the agreed order was entered by the trial court. On February 23, 2012, Steve filed his notice of appeal.

¶ 24                                       II. ANALYSIS

¶ 25                               A. Jurisdictional Issues

¶ 26      Jason raises the issues of whether Steve's notice of appeal was timely filed, and, if not, whether his appeal should be stricken. In response, Steve has filed a motion to strike Jason's brief, arguing he has no standing to interfere with Steve's request for visitation with his biological child. Steve contends Jason has not adopted J.W. and the presumption he was J.W.'s father has been rebutted by the trial court's finding Steve was J.W.'s biological father. Steve's motion was taken with the case and will be resolved prior to reaching the issue raised by Jason.

¶ 27      On April 17, 2009, pursuant to Steve's request, his parentage action, No. 09-F-12, and the prior dissolution of marriage action between Jason and Amy, No. 05-D-232, were consolidated. Steve did not raise the issue of Jason's lack of standing to participate in the parentage portion of the proceedings determining whether visitation with Steve was in the best interest of J.W., who was Jason's legal daughter when Steve asked the cases be consolidated. Steve did attempt to raise the issue orally during the June 2011 hearing on his visitation when Jason's counsel first attempted to cross-examine a witness at that hearing. The trial court denied the objection as to Jason's standing and allowed him to participate fully in the hearing on Steve's request for visitation.

¶ 28      Jason argues he is a judicially recognized parent of J.W. with visitation and support obligations in full force and effect. No court order has changed his parental rights relating to J.W.

¶ 29      Steve's arguments concerning Jason's lack of standing are disingenuous. Steve invited participation by Jason by asking the cases be consolidated and stating, in his motion to consolidate, the matters in both cases were "interrelated" as they both involved custody and visitation rights with J.W. He requested the consolidation "to ensure consistency and uniformity in court orders as well as ensuring judicial economy." Jason no longer has the presumption of being J.W.'s father, but he has an ongoing relationship with her as the only father she has ever known and has legal rights and responsibilities resulting from the dissolution proceedings. To achieve consistency and uniformity in court orders, Jason would be a necessary party to the proceedings in order that his rights and responsibilities toward J.W. were protected or enforced.

¶ 30      Steve may not want Jason to argue against visitation between Steve and J.W. The best interests of J.W. control, not what Jason may or may not want in regard to who spends time with J.W. At the same time, Jason was made a party to the parentage action upon Steve's request and for good reasons. He has standing to participate in this appeal. Steve's motion to strike Jason's brief is denied.

¶ 31      Jason contends Steve's appeal was not timely filed and the appeal should be stricken. We disagree and find Steve's appeal timely filed. The trial court's order finding Steve to be J.W.'s biological father was entered on September 9, 2009. The order denying him visitation with J.W. was not entered until July 18, 2011. In the July 2011 order, the court stated it was reserving issues as to child support at that time and would hear evidence on that issue at a later date. This July 2011 order made no finding it was a final and appealable order for

purposes of Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). On December 8, 2011, the case was called for a conference on child support in the court's chambers. The case was rescheduled for January 26, 2012, on which date the court received an agreed order as to child support. On February 15, 2012, the trial court entered a written order as to child support. All issues were resolved and a final, appealable order was entered. Steve filed his notice of appeal on February 23, 2012, appealing just the issue of visitation. No final order was entered in the case until February 15, 2012. Steve's appeal filed eight days later was timely filed.

¶ 32                                 B. Burden of Proof

¶ 33    Steve argues the trial court applied the wrong burden of proof when it held the burden of proof is on the noncustodial parent seeking visitation under the Parentage Act to establish visitation is in the best interest of the minor child involved. This was the position this district of the Illinois Appellate Court announced in *Department of Public Aid ex rel. Gagnon-Dix v. Gagnon*, 288 Ill. App. 3d 424, 428, 680 N.E.2d 509, 512 (1997). Steve argues both this and other districts of this court have disagreed with the *Gagnon* decision and applied a different burden of proof when a noncustodial parent seeks visitation with his child. We have reviewed the cases cited by Steve and conclude the standard for all noncustodial parents should be the same whether the case originates under the Parentage Act or the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2010)).

¶ 34    In *Gagnon*, a case brought under the Parentage Act, we found, despite an order establishing paternity and setting child support, the father was not automatically entitled to visitation, especially where the child was already eight years old and had never met him. *Gagnon*, 288 Ill. App. 3d at 427, 680 N.E.2d at 511. Section 14(a)(1) of the Parentage Act (750 ILCS 45/14(a)(1) (West 2010)) states visitation privileges for the noncustodial parent shall be determined in accordance with the "relevant factors" of the Marriage Act (750 ILCS 5/101 *et seq.* (West 2010)) when determining the best interests of the child. In *Gagnon*, this court held the provision of section 14(a)(1) was a reference to section 602 of the Marriage Act (750 ILCS 5/602 (West 2010)), which lists factors to be considered in determining the best interests of a child and is not a reference to section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 2010)), which states a noncustodial parent is "entitled" to "reasonable" visitation unless visitation would seriously endanger the child's "physical, mental, moral or emotional health." (Internal quotation marks omitted.) *Gagnon*, 288 Ill. 2d at 427-28, 680 N.E.2d at 512. We held section 14(a)(1)'s reference to "relevant standards" found in the Marriage Act means not every rule a court would apply in a dissolution of marriage case applies in a parentage case. *Gagnon*, 288 Ill. App. 3d at 428, 680 N.E.2d at 512. We found no presumption it is in the best interest of a child to have visitation with a biological father who has had nothing to do with the child for eight years.

¶ 35    The first case Steve cites in opposition to our holding in *Gagnon* is the Third District's decision in *Wenzelman v. Bennett*, 322 Ill. App. 3d 262, 748 N.E.2d 1266 (2001). In *Wenzelman*, the court stated "absent exigent circumstances," biological parents enjoyed a

presumption they are entitled to visitation whether visitation is requested under the Marriage Act or the Parentage Act. *Wenzelman*, 322 Ill. App. 3d at 263, 748 N.E.2d at 1267. The court went on to distinguish *Gagnon* by noting an exigent circumstance existed there and it was interpreting *Gagnon* to mean any parent seeking visitation after eight years of no contact with a child has the burden of proof to show visitation is in the child's best interest. *Wenzelman*, 322 Ill. App. 3d at 264-65, 748 N.E.2d at 1268.

¶ 36    The Fifth District in *Jines v. Jurich*, 335 Ill. App. 3d 1156, 1160, 783 N.E.2d 147, 150 (2002), and the First District in *In re Parentage of Melton*, 314 Ill. App. 3d 476, 481, 732 N.E.2d 11, 15 (2000), both disagreed with *Gagnon* and held section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 2010)) should be considered as a "relevant" standard to be considered when determining visitation rights in a case brought under the Parentage Act, thus entitling a noncustodial parent to visitation unless it can be shown visitation with the parent will endanger the child.

¶ 37    We acknowledge these cases and their holdings and conclude our decision in *Gagnon* should be revisited.

¶ 38    Our decision in *In re Marriage of Slayton*, 292 Ill. App. 3d 379, 685 N.E.2d 1038 (1997), permitted visitation with the presumed father, who was not the child's biological father. We applied section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 1994)). This is not logically consistent with our decision in *Gagnon*.

¶ 39    We conclude section 607(a) of the Marriage Act is the relevant standard to be considered whether visitation is sought under the Parentage Act or the Marriage Act. We are confident trial courts can sort out those cases such as *Gagnon*, where a biological father sought visitation after no contact for eight years, and *Slayton*, where a presumed father eagerly sought continued visitation and contact with the son born during his marriage to the child's mother.

¶ 40    The applicable standard here is section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 2010)). There is a presumption Steve Taylor is entitled to reasonable visitation rights unless visitation would endanger seriously J.W.'s physical, mental, moral, or emotional health. The trial court erred when it placed the evidentiary burden on Steve to show visitation was in the best interest of his daughter. The court justifiably looked at our decision in *Gagnon* and also noted cases from other districts that have distinguished or declined to follow *Gagnon*. We do not fault the court for following *Gagnon*, but as we decline to follow that decision, we also note the facts before us are substantially different from those in *Gagnon* and other cited cases.

¶ 41    Steve had no knowledge he was a father until he looked at Amy's account on a social media site and saw her child. He noted the child's resemblance to him and contacted Amy. Shortly thereafter DNA testing proved he was J.W.'s biological father. Between 2001 and 2008, Steve had little or no contact with Amy and did not suspect he was a father. The November-December 2008 contact Steve and his family then had with J.W. has been styled as the beginning of a parent-child relationship. It is difficult to determine from this record whether J.W., then 5 1/2 years old, fully understood her connection to Steve or his family, but it is clear there was no delay on Steve's part in attempting to establish a healthy,

meaningful relationship with J.W.

¶ 42                                    C. Best Interest Hearing

¶ 43       After the hearing on visitation, the trial court found at the present time it was not in J.W.'s best interest to introduce or reintroduce Steve into her life. Steve argues it was an abuse of discretion for the trial court to deny visitation to him.

¶ 44       A trial court has broad discretion in fashioning the terms of visitation and its decision will not be overturned absent abuse of that discretion. *In re Marriage of Engelkens*, 354 Ill. App. 3d 790, 792, 821 N.E.2d 799, 802 (2004).

¶ 45       Steve presented evidence indicating he and J.W. had a great deal of fun together when he was introduced as her "real" dad in November and December 2008. He and his witnesses testified they had no trouble bonding over the Thanksgiving and Christmas holiday season when Amy chose to spend the holidays with Steve and his extended family. However, the unrebutted testimony of Dr. Frey and the GAL showed J.W. did not know who Steve was to her, failing to identify him to Dr. Frey and identifying him as a friend of her mother's to the GAL. J.W.'s actions and behavior did not fully support Steve's claims of a close and loving relationship between him and J.W. Two months of holiday interaction do not cancel out or overcome years of no contact at all, and cannot be deemed an established relationship.

¶ 46       Dr. Frey testified, based on J.W.'s stage of development, introducing Steve to her at this time and starting visitation would place J.W. at increased risk of harm academically, socially, and emotionally. Dr. Osgood, on behalf of Steve, and Steve criticized Dr. Frey's opinions as to risk of harm to J.W. because Dr. Frey based them on long-standing theories of child development raised in the 1950s and 1960s and they were speculative rather than certain to occur.

¶ 47       The theories were developed a number of years ago, but nothing in the record indicates they had been refuted in the psychological community. Any prediction of risk possibly incurred in future events is speculative but still may be worthy of consideration. There is also the risk J.W. may resent those persons who prevented her biological father from establishing a relationship with her, particularly when he made a concerted effort to do so. We do not discount the concerns raised by Dr. Frey, but in the context of this case, those concerns and opinions do not show Steve would seriously endanger J.W.'s physical, mental, moral, or emotional health. The trial court could have taken steps to reduce any risk of harm by gradually introducing J.W. to Steve under the guidance of an experienced professional. Visitation need not be expansive for it to be meaningful.

¶ 48       J.W. is fortunate to have both a legal, or presumed, father and a biological father who want involvement in her life. Both Steve and Jason are to be complimented for their care and interest in J.W. Both of them have the opportunity to create an ongoing relationship with J.W. and to do so without impinging on the visitation time Jason now enjoys.

¶ 49       Based on this record, it would appear their efforts will be critical in assuring J.W.'s best interests will be met.

¶ 50       The trial court conscientiously evaluated the evidence but did so using a standard we no

longer believe applies. Steve bore no initial burden of proof, and the evidence presented did not show visitation would seriously endanger J.W.'s physical, mental, moral, or emotional health. Steve should be permitted to have reasonable visitation, and we have briefly noted a cautious and gradual approach. The key here is the word "reasonable"–that applies not only to visitation but also to the mind-set of Amy, Jason, and Steve. If they are reasonable and cooperative, J.W. will prosper, as will their relationship with her.

¶ 51                                        III. CONCLUSION

¶ 52       We reverse the trial court's judgment and remand the cause for the creation and implementation of visitation as directed by the trial court and in keeping with the views expressed herein.

¶ 53       Reversed and remanded with directions.