# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Wittendorf v. Worthington*, 2012 IL App (4th) 120525

---

| | |
|---|---|
| Appellate Court Caption | GEANNETTE S. WITTENDORF, Plaintiff-Appellant, v. KENNETH WORTHINGTON, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket Nos. 4-12-0525, 4-12-0526 cons. |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | November 6, 2012<br><br>November 30, 2012<br>November 6, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings involving the determination of visitation for a child born to the unmarried parties during their abusive relationship, the trial court abused its discretion in creating a schedule that failed to provide for a gradual reintroduction of defendant to his son and by modifying plaintiff's order of protection to allow for personal contact with defendant; therefore, the cause was remanded for a redetermination of visitation. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, Nos. 11-F-57, 11-OP-1021; the Hon. Brian Otwell, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |

| Counsel on Appeal | James F. Hurst, Lisa M. Lukaszewski, and Samuel S. Park (argued), all of Winston & Strawn LLP, of Chicago, for appellant. |
|---|---|
| | Barbara K. Myers (argued), of LaBarre, Young & Behnke, of Springfield, for appellee. |
| | Barry Levenstam, of Jenner & Block LLP, of Chicago, and Susan J. Kohlmann and Ali M. Arain, both of Jenner & Block LLP, of New York, New York, for *amici curiae.* |
| Panel | JUSTICE COOK delivered the judgment of the court, with opinion Justices Appleton and Knecht concurred in the judgment and opinion. |

## OPINION

¶ 1    Petitioner, Geannette Wittendorf, and respondent, Kenneth Worthington, are the biological parents of L.W., born September 19, 2010. The parties were never married. On April 20, 2012, the trial court awarded Geannette residential custody of L.W. and Kenneth unsupervised visitation. The court also modified Geannette's order of protection against Kenneth to allow for personal, mail, and telephonic contact to the extent that it is strictly necessary to effectuate the terms of the visitation order. On April 20, 2012, Geannette filed a motion for rehearing. On May 18, 2012, after a hearing on the motion, the court affirmed its decision as to visitation and modification of the order of protection. Geannette appeals, and we reverse and remand as to visitation and affirm the court's modification of the order of protection.

¶ 2                              I. BACKGROUND
¶ 3    In May 2008, Geannette Wittendorf and Kenneth Worthington began a romantic relationship. Two months earlier, the parties met at Brewsky's Bar in Rockford, Illinois, where Kenneth was working as a bouncer. At that time, Geannette was employed as a prosecutor for the Winnebago County State's Attorney's office. Geannette testified that her first significant conversation with Kenneth occurred when he asked her for advice about an outstanding arrest warrant for domestic abuse. In August 2008, the couple began living together.

¶ 4    According to Geannette the following incidents of abuse occurred from September 2008 to July 2009:

¶ 5    On September 23, 2008, Kenneth got angry at Geannette and tore his alarm clock from the outlet and proceeded to smash it to pieces.

¶ 6    On December 22, 2008, during an argument about one of Geannette's ex-boyfriends, Kenneth punched a hole in the wall of the parties' apartment. At the time, Geannette was standing next to the wall.

¶ 7    In April 2009, Kenneth and Geannette went out for drinks at a bar and Kenneth became intoxicated. When they returned home to their apartment complex, they could not find any available parking spots, and their upstairs neighbors were having a party. Kenneth started an argument with their upstairs neighbors regarding the lack of parking spots. During the course of the argument, Kenneth kicked a dent in their neighbors' front door. As a result, the neighbors called the police. When the police arrived, Kenneth denied causing the damage and Geannette asked the police to leave: "Well it doesn't appear you have enough probable cause; otherwise you would have arrested him, so I'm going to ask you to leave, please." The police left the premises and Kenneth and Geannette went to bed.

¶ 8    Later that same evening, Geannette tried to wake up Kenneth to answer one of the parties' cell phones. Geannette testified that Kenneth became "enraged" from being woken up and asked her, "Why the fuck are you waking me up...get the fuck off of me bitch." Geannette tried to leave the apartment and Kenneth pinned her to the floor and slapped her across the face. After the incident, Geannette left the apartment to call some friends for help. Two of those friends contacted the police. When the police arrived, Geannette refused to answer their questions. At trial, Geannette stated that she did not disclose the abuse to the police because she "still loved [Kenneth]." Moreover, she "knew [Kenneth] would go to jail *** and he would be prosecuted and go to prison" due to a prior felony conviction.

¶ 9    On June 7, 2009, during an argument, Kenneth slapped Geannette across the face and then smashed, with a wooden mallet, her antique standing mirror.

¶ 10    On June 29, 2009, Kenneth and Geannette were driving home from celebrating Kenneth's birthday. During the drive, the couple got into an argument and Kenneth proceeded to smash the car windshield with his fist. Once inside the couple's home, Kenneth grabbed the garbage can and threw it against the dining room window, shattering it.

¶ 11    On July 7, 2009, Geannette saw Kenneth using a Scrabble board in their apartment. The following day, she saw spelled out on the board the words " '[r]evenge,' 'rage,' 'crazy,' 'ho,' 'ouch,' 'hate,' [and] 'sad.' "

¶ 12    On July 17, 2009, Geannette went on a motorcycle ride with a friend. After Geannette told Kenneth about the ride, he destroyed the motorcycle helmet Geannette had worn and kicked in the door from the garage to the house. In response, Geannette locked herself in the bedroom and Kenneth proceeded to kick in the bedroom door. That same month, while staying at the Planet Hollywood Hotel in Las Vegas, Nevada, Kenneth pushed Geannette's head into a headboard. The incident occurred after Geannette woke up Kenneth.

¶ 13    In fall 2009, the couple decided to move to Georgia where Kenneth's family was located. Before leaving Illinois, Geannette and Kenneth got engaged.

¶ 14    In January 2010, Geannette discovered that she was pregnant. The following month, Geannette and Kenneth moved to Georgia. Geannette found a job working for the Georgia Department of Children and Family Services.

¶ 15    According to Geannette's allegations, in July 2010, Kenneth purchased a shotgun while

visiting his mother in Alabama.

¶ 16    On September 19, 2010, Geannette gave birth to a boy, L.W. Kenneth was present for the birth. The next day, he successfully interviewed for a job wiring televisions that required frequent travel. As a result, Kenneth was sporadically present after L.W.'s birth. According to Kenneth, he spent some weekends with L.W. during the child's first four months of life.

¶ 17    In November 2010, Sara Cavanagh, a friend of Geannette's and an attorney for the Winnebago County State's Attorney's office, visited Geannette in Georgia. During Sara's visit, Kenneth offered to stay with L.W. so the women could have a "girl's night." Sara and Geannette went out for dinner and attended a party. At the end of the night, Sara tried to arrange for a cab ride home because they had been drinking. According to Sara, Geannette consumed "four, five mixed drinks and some shots." It was the first time Geannette had drunk alcohol since she had been pregnant with L.W. However, Sara was unable to get a cab and called Kenneth for a ride. She testified that Kenneth refused to help them and "was screaming about Geannette being a fucking whore and that she was probably, quote, fucking some guy and that she disgusted him and all these horrible things." Eventually, Geannette and Sara were able to find a cab home. Upon arriving at Geannette's apartment, Sara gathered her things and left for a hotel. Geannette decided to stay at the apartment and went to bed. Shortly thereafter, L.W. began crying. According to Geannette, Kenneth picked up L.W. first and said something like, "You're not touching him, he's mine." Geannette tried to comfort L.W. and, in response, Kenneth backhanded her on the right side of her face. At the time, Kenneth was holding L.W. Geannette then went to look for her phone to contact the police but Kenneth found his phone first and called the police to remove Geannette from the parties' apartment. When the police arrived, Geannette told the officer that Kenneth hit her; however, she did not say anything more because she was afraid that Georgia's Department of Children and Family Services would take custody of L.W. At trial, Geannette testified that she agreed to go to a hotel for the rest of the night because she had been drinking. In contrast, Kenneth testified that the police "removed" Geannette from the apartment. L.W. remained under Kenneth's care for the remainder of the night. The next day, Geannette asked Kenneth to move out of the apartment.

¶ 18    In December 2010, Geannette's maternity leave expired so she asked Kenneth to take care of L.W. while she was at work. She testified that she left L.W. with Kenneth because "I didn't feel I had very many options at that point, and I was just hoping that having [L.W.] would change him." The childcare arrangement lasted for only two days. On the first day, Kenneth texted Geannette that she was a "fuckin bitch" for not defrosting L.W.'s milk. On the second day, Geannette returned home to find Kenneth overwhelmed and frantic. As a result, Geannette asked her mother for money to enroll L.W. in daycare.

¶ 19    On February 1, 2011, Geannette returned to Illinois with L.W. Two days later, she filed a petition to establish parentage requesting the trial court to enter an order requiring Kenneth to pay child support for L.W. (case No. 11-F-57).

¶ 20    On March 30, 2011, Kenneth filed a petition to establish parentage.

¶ 21    On March 31, 2011, Geannette filed an amended petition to establish parentage as well as a petition for temporary relief asking for child support.

¶ 22		On April 22, 2011, the trial court held a hearing at which Kenneth confirmed that he was L.W.'s father. The court continued the cause until June 3, 2011, for a hearing on all pending issues.

¶ 23		On May 4, 2011, Geannette served a number of discovery requests on Kenneth, including a request to admit facts. Kenneth failed to timely respond to the request. However, the request failed to include the warning, required under Illinois Supreme Court Rule 216(g) (eff. Jan. 1, 2011), regarding the consequences of not responding to the request for admission of fact.

¶ 24		On May 16, 2011, the trial court awarded Geannette legal custody of L.W.

¶ 25		On June 1, 2011, Geannette filed a motion to deem facts admitted, which the trial court later granted.

¶ 26		On June 6, 2011, Geannette filed a petition for an emergency order of protection against Kenneth (case No. 11-OP-1021). In the petition, Geannette alleged that from September 2008 to November 2010 Kenneth committed multiple acts of abuse, referenced earlier in this opinion, against her. She also alleged that, earlier that week, Kenneth appeared unannounced at her workplace and was irate with her staff. Geannette further claimed that Kenneth sent her an email indicating he knew her address in Springfield, Illinois. Later that day, the trial court issued an emergency order of protection prohibiting Kenneth from contacting Geannette or L.W.

¶ 27		On June 20, 2011, Kenneth was served with the emergency order of protection and summons.

¶ 28		On June 23, 2011, after a hearing, the trial court entered a plenary order of protection against Kenneth. Kenneth failed to appear for the hearing. Under the order, visitation was "reserved until F case." Kenneth filed an untimely motion to vacate the order, and the court denied the motion.

¶ 29		On October 7, 2011, and February 9, 2012, the trial court held hearings concerning Geannette's petition to establish parentage and obtain child support. At the first hearing, Geannette's counsel asked the court to deny Kenneth unsupervised visitation based on the facts set forth in the request for admission of facts. After an analysis of each fact, the court concluded that none of the admitted facts "individually or in combination, meets the standards for restricting the visitation as requested and in view of this Court."

¶ 30		During the first hearing, Geannette called three witnesses, in addition to herself, to testify on her behalf. Sara Cavanagh testified that when she worked with Geannette at the Winnebago County State's Attorney's office she noticed "[u]nexplained bruising" on Geannette's body. In January 2009, while staying at the couple's apartment, she overhead Kenneth verbally abusing Geannette. She stated that "I could hear how Ken spoke to her *** I mean it's horrifying. It's not even things I want to say in court, but you know, I'll apologize for my language. 'You are a fucking whore "***" You're a bitch.' "

¶ 31		Tanya Schnabel, a friend of Geannette's and a child protection advanced specialist for the Illinois Department of Children and Family Services, also testified on Geannette's behalf. In April 2009, Tanya stated that she received a phone call from Geannette requesting that she come over to her apartment. Upon arriving, Tanya saw bruises on Geannette's wrist and a

-5-

bruise on her cheek. She further testified to seeing, on other occasions, unexplained bruises on Geannette, including "bruises on her arms that were consistent with finger marks."

¶ 32     Shadia Haddad Gerges, a friend of Geannette's and a former prosecutor for the Winnebago County State's Attorney's office in the Domestic Violence Unit, testified on Geannette's behalf. She primarily testified regarding the stages of domestic abuse and the negative impact of exposure to domestic violence on children.

¶ 33     During the hearing, Geannette testified at length concerning the incidents of abuse referenced earlier in this order. She also offered into evidence photographs she had taken of property damaged by Kenneth as part of the abusive incidents, including a shattered mirror, a cracked windshield, a kicked-in door, a broken helmet, and a wall with a large hole in the drywall. Additionally, Geannette explained that she did not report the incidents of abuse to the police because she was ashamed to be in an abusive relationship, especially in light of her profession. She testified: "I didn't call the police because I was embarrassed and ashamed to be in a situation like that as an attorney. I knew everyone. I knew all the cops, I knew–I didn't want to go in front of the courthouse, in front of everybody and put this out there, and Ken–I was scared he would become more psychotic, and I also felt for him. I thought maybe it is me, maybe it's–I don't know."

¶ 34     At the February 9, 2012, hearing, Kenneth testified that he was not violent toward Geannette, but admitted that he and Geannette had "been verbally abusive to one another." During the hearing, Kenneth testified that while Geannette was outside of the home he changed and fed L.W. Kenneth requested that visitation take place once a month in Georgia and offered to have his two sisters help him care for L.W. One of Kenneth's sisters has a daughter and the other is a school teacher.

¶ 35     Following the hearing, the trial court granted Kenneth temporary visitation to occur on February 10 and 11. The visits were to be from 9 a.m. to noon and supervised by L.W.'s daycare provider, or in her absence, Kenneth's sister.

¶ 36     On April 4, 2012, the trial court issued an order awarding Geannette residential custody of L.W. and Kenneth visitation. In making its decision, the court applied the "endanger seriously" standard set forth in section 607(a) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/607(a) (West 2010)). The court specifically found, "[Geannette's] asserted rationale, that visitation by [r]espondent poses a serious risk of harm to the child, was not borne out by the evidence in this case. See 750 ILCS 5/607(a)." In reaching its decision, the court emphasized that the November 2011 "girls night out incident" provided a "more rounded picture of the relationship between these parties" than the allegations of abuse made by Geannette or the testimony of Geannette's witnesses. The court stressed the fact that the police decided to leave L.W. in Kenneth's care. Additionally, the court stressed the parties' unwillingness to work together in L.W.'s best interest. The court singled out Geannette for denying Kenneth the opportunity to see his son: "[Geannette] in particular has refused to allow visitation surrounding [Kenneth's] multiple trips from Georgia to Illinois for hearings in this matter."

¶ 37     In setting the visitation schedule, the trial court emphasized the need to "gradually increase the frequency and especially duration of contact" between L.W. and Kenneth. Under

the visitation schedule, for the third weekend of April and May, Kenneth was to have visitation from Saturday at noon through Sunday at 3 p.m. Beginning June 9, 2012, Kenneth's visitation increased to every three weeks from Friday at 5 p.m. through Sunday at 5 p.m. Kenneth was also given visitation over the Christmas holiday from December 25, 2012, at noon through December 30, 2012, at 5 p.m. The terms of the order did not require that the visitation be supervised or take place in Illinois. Kenneth is responsible for transporting L.W. to and from his scheduled visits.

¶ 38    To facilitate visitation, the trial court modified Geannette's order of protection to allow for personal, mail, and telephonic contact "to the extent that such is strictly necessary to effectuate the terms" of the order. Last, the court awarded Kenneth a $110 child support credit and an income tax exemption for L.W. in even-numbered years.

¶ 39    On April 20, 2012, Geannette filed a motion for rehearing, alleging that the trial court erred by (1) finding that Kenneth did not pose a serious risk of harm to L.W., (2) ignoring the findings made by the court when it entered a plenary order of protection, (3) ordering "residential custody," (4) awarding Kenneth visitation when he had been ordered to have no contact with L.W. under the plenary order of protection, (5) awarding Kenneth a $110 child support credit, and (6) granting Kenneth an income tax exemption for L.W. in even-numbered years.

¶ 40    On May 18, 2012, after a hearing, the trial court denied Geannette's motion to reconsider except it reversed the $110 child support credit awarded to Kenneth. The court determined that "even under the best interests standard" set forth in section 602 of the Marriage Act (750 ILCS 5/602 (West 2010)), its decision as to visitation would be the same.

¶ 41    On June 12, 2012, Geannette filed a notice to appeal both orders, and this court consolidated the appeals.

¶ 42                            II. ANALYSIS

¶ 43                            A. Visitation

¶ 44    On appeal, Geannette argues that the trial court erred in granting Kenneth unsupervised visitation, because the court applied the "endanger seriously" standard set forth in section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 2010)) rather than the "best interests" standard provided in section 602 of the Marriage Act. In her supplemental brief on appeal, Geannette alternatively argues that the court erred in granting Kenneth unsupervised visitation under the "endanger seriously" standard, because she presented overwhelming evidence of the dangerous and abusive nature of Kenneth's conduct.

¶ 45    This case arises under section 14 of the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/14 (West 2010)). Section 14(a)(1) of the Parentage Act provides that, if a judgment of parentage contains provisions for visitation, then the court shall determine visitation

      "in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child. In determining custody, joint custody, removal, or

visitation, the court shall apply the relevant standards of the Illinois Marriage and Dissolution of Marriage Act, including Section 609." 750 ILCS 45/14(a)(1) (West 2010).

¶ 46     Kenneth argues that section 14(a)(1) of the Parentage Act incorporates section 607(a) of the Marriage Act. Section 607(a) of the Marriage Act sets forth the "serious endangerment" standard for awarding visitation. The "serious endangerment" standard requires that a court award visitation to a noncustodial parent unless the court finds, after a hearing, that visitation "would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 5/607(a) (West 2010). The "serious endangerment" standard is "onerous, stringent, and rigorous." (Internal quotation marks omitted.) *In re Marriage of Slayton*, 292 Ill. App. 3d 379, 386, 685 N.E.2d 1038, 1043 (1997).

¶ 47     We disagree and find that section 14(a)(1) of the Parentage Act incorporates section 602 of the Marriage Act and not section 607 of the Marriage Act. *Department of Public Aid ex rel. Gagnon-Dix v. Gagnon*, 288 Ill. App. 3d 424, 428, 680 N.E.2d 509, 512 (1997). Section 602 lists relevant factors to consider in determining the best interests of a child.

¶ 48     In section 14(a)(1), the "reference to '*relevant* standards' makes it clear that not every rule a court would apply to a parent in a dissolution of marriage case applies with equal force to a parent in a parentage case. (Emphasis added.) 750 ILCS 45/14(a)(1) (West 1994)." *Gagnon*, 288 Ill. App. 3d at 428, 680 N.E.2d at 512. In *Gagnon*, this court found that there is no presumption that it is in the best interest of a child to have visitation with a biological father who has had nothing to do with the child for eight years. *Gagnon*, 288 Ill. App. 3d at 428, 680 N.E.2d at 512. In making its determination, this court pointed to the fact that the parental rights of an unmarried father may be terminated if he fails to establish paternity, pay birth expenses, or provide support. *Gagnon*, 288 Ill. App. 3d at 428, 680 N.E.2d at 512.

¶ 49     The burden of proof is on the noncustodial parent seeking visitation to show that visitation would be in the child's best interest. *Gagnon*, 288 Ill. App. 3d at 428, 680 N.E.2d at 512. "A request for visitation might in some cases be a vindictive response to a request for child support, and the noncustodial parent's goal might not be the development of a relationship with the child, but the annoyance of the custodial parent." *Gagnon*, 288 Ill. App. 3d at 428, 680 N.E.2d at 512.

¶ 50     On review, a trial court's decision regarding visitation will not be disturbed absent an abuse of discretion. *Weybright v. Puckett*, 262 Ill. App. 3d 605, 608, 635 N.E.2d 119, 122 (1994).

¶ 51     We find that the trial court abused its discretion in setting the visitation schedule because the schedule fails to account for L.W.'s tender age and lack of familiarity with Kenneth. At the time the visitation order was entered, L.W. was approximately 16 months old. In setting the visitation schedule, the court specifically noted the need to "gradually increase the frequency and especially duration of contact" between L.W. and Kenneth. However, the visitation schedule does not provide for the gradual reintroduction of father and son. After only two supervised visits of three hours each, the court awarded Kenneth overnight, unsupervised weekend visitation from Saturday at noon through Sunday at 3 p.m. This schedule was for April and May. Beginning in June, Kenneth's visitation was again increased to every three weeks from Friday at 5 p.m. through Sunday at 5 p.m. Moreover, outside of

the initial two supervised visits, the court did not require that visitation take place in Illinois. The record does not indicate that Kenneth was planning on exercising his right to visitation in Illinois. Requiring a toddler to travel from Illinois to Georgia for monthly visitation does not account for his tender age, especially in light of the fact that L.W. is expected to make the trip within a 48-hour period.

¶ 52 The visitation schedule also fails to adequately consider L.W.'s unfamiliarity with his father. Since his birth, L.W. has had limited contact with his father. At the time visitation was awarded, L.W. had not seen his father for over a year. A year is a significant amount of time in the life of a 16-month-old. We recognize that contact between L.W. and Kenneth was prohibited in part by the June 2011 order of protection; however, Kenneth was only sporadically present when L.W. lived in Georgia. Based on the evidence, the visitation schedule set by the court was not in L.W.'s best interests.

¶ 53 In reaching this conclusion, we distinguish the recently decided *In re Parentage of J.W.*, 2012 IL App (4th) 120212, 972 N.E.2d 826, *appeal pending*, No. 114817. In *J.W.*, Amy conceived a child, J.W., who was born in April 2002. At the time, Amy was involved in a romantic relationship with Jason. However, during that period, she also had a one-time sexual encounter with Steve. Amy later married Jason believing him to be her child's father. The couple divorced in January 2006.

¶ 54 In summer 2008, after seeing a photograph of J.W. on a social media site, Steve contacted Amy regarding the possibility that he may be the child's father. Prior to 2008, Steve had no reason to suspect that he was J.W.'s father. Amy indicated a possibility of paternity and Steve decided to undergo genetic testing to determine his paternity. Deoxyribonucleic acid (DNA) tests were performed and indicated that Steve was J.W.'s biological father. Shortly thereafter, Amy began a romantic relationship with Steve. Amy encouraged the formation of a parental relationship between Steve and J.W. That winter, J.W. spent the holidays with Steve and his family. At trial, Steve's sisters testified to the good relationship between Steve and J.W.

¶ 55 In February 2009, Steve filed a petition to determine parentage and requested joint custody. He later requested visitation.

¶ 56 In the dissolution of marriage case between Amy and Jason, the trial court entered an order, at Jason's request, prohibiting Amy from residing with Steve or allowing contact between Steve and J.W. In April 2009, the parentage and dissolution actions were consolidated. The court determined that Steve failed to meet the burden of proving that visitation was in J.W.'s best interest and did not award him any visitation.

¶ 57 This court reversed and remanded the trial court's denial of visitation. In making our decision, we determined that section 607(a) of the Marriage Act is the relevant standard to be considered regardless of whether visitation is sought under the Parentage Act or the Marriage Act. *J.W.*, 2012 IL App (4th) 120212, ¶ 39, 972 N.E.2d 826. Based on the evidence, we found that visitation would not seriously endanger J.W.'s physical, mental, moral, or emotional health. *J.W.*, 2012 IL App (4th) 120212, ¶ 50, 972 N.E.2d 826. We emphasized that there was "no delay on Steve's part in attempting to establish a healthy, meaningful relationship with J.W." *J.W.*, 2012 IL App (4th) 120212, ¶ 41, 972 N.E.2d 826. As soon as

-9-

Steve was aware of his potential parentage of J.W. in 2008, he strove to form a relationship. We did not overrule *Gagnon*, where we applied the best interests standard set forth under section 602 of the Marriage Act to a visitation determination under the Parentage Act, but rather distinguished it from cases like *Slayton* and *J.W.* Specifically, we stated "[w]e are confident trial courts can sort out those cases such as *Gagnon*, where a biological father sought visitation after no contact for eight years, and *Slayton*, where a presumed father eagerly sought continued visitation and contact with the son born during his marriage to the child's mother." *J.W.*, 2012 IL App (4th) 120212, ¶ 39, 972 N.E.2d 826.

¶ 58       In this case, unlike Steve in *J.W.*, Kenneth was minimally involved in his child's life. Based on the evidence, even before she moved with L.W. back to Illinois, Geannette was L.W.'s primary caregiver. During L.W.'s first four months of life, Kenneth testified that he was only present for a couple weekends. In contrast, as soon as Steve was aware of his potential parentage of J.W., he attempted to form a relationship with her. This court emphasized that Steve did not delay in trying to establish a "healthy, meaningful relationship with J.W." *J.W.*, 2012 IL App (4th) 120212, ¶ 41, 972 N.E.2d 826.

¶ 59       In determining visitation, the trial court should have applied the best interests standard set forth in section 602. However, we find that under the best interests standard or "endanger seriously" standard, the court abused its discretion in setting a visitation schedule that does not provide for a gradual reintroduction of the father and child and fails to account for L.W.'s tender age and lack of familiarity with Kenneth. On remand, the court shall create a new visitation schedule that is limited to supervised visitation in Springfield, Illinois. Under the new schedule, no overnight visitation shall be authorized.

¶ 60                                        B. Order of Protection

¶ 61       Geannette also argues that the trial court abused its discretion by modifying her plenary order of protection against Kenneth to facilitate unsupervised visitation, since the Illinois Domestic Violence Act of 1986 specifically authorizes courts to restrict visitation if the party has acted or is likely to act in a manner that is not in the child's best interests. 750 ILCS 60/214(b)(7) (West 2010). The court modified the plenary order to allow for personal, mail, and telephonic contact "to the extent that such is strictly necessary to effectuate the terms" of the order.

¶ 62       The standard of review for modifying an order of protection is an abuse of discretion. *In re Marriage of Fischer*, 228 Ill. App. 3d 482, 489, 592 N.E.2d 604, 608 (1992). "[T]he question is whether the trial court made an arbitrary decision, without using conscientious judgment, or whether, in view of all of the circumstances, the trial court overstepped the bounds of reason, ignored the law, and thereby caused substantial prejudice to the appellant." *In re Marriage of Munger*, 339 Ill. App. 3d 1104, 1107, 791 N.E.2d 573, 576 (2003).

¶ 63       Based on the evidence, the trial court abused its discretion in modifying Geannette's plenary order of protection to allow for personal contact. The restriction imposed by the court on the amount of personal contact between the parties fails to adequately account for the tumultuous nature of the parties' relationship. In this case, even minimal personal contact between the parties opens the door for harassment and abuse.

-10-

¶ 64                                    III. CONCLUSION

¶ 65      For the foregoing reasons, the trial court's modification of the plenary order of protection is affirmed except as to the allowance of personal contact between the parties. The trial court's determination of visitation is reversed and remanded for a redetermination of visitation in accordance with this order.

¶ 66      Affirmed in part and reversed in part; cause remanded with directions.